ELEANOR J. MICHALKO AND PAUL MICHALKO, HER HUS-
BAND, PLAINTIFFS-APPELLANTS, v. COOKE COLOR AND
CHEMICAL CORP. A/K/A COOKE DIVISION OF REICHOLD
CHEMICALS CORP., SQUARE D COMPANY, AND E DISTRIBU-
TION COMPANY (FICTITIOUS NAME), DEFENDANTS, AND
CUBBY MANUFACTURING COMPANY, DEFENDANT-RE-
SPONDENT.

Argued February 22, 1982—Decided August 16, 1982.

388

*Douglas S. Brierley* argued the cause for appellants (*Schenck, Price, Smith & King,* attorneys; *William R. Albrecht,* of counsel).

*Donald S. McCord, Jr.* argued the cause for respondent (*O'Donnell, McCord & Leslie,* attorneys).

The opinion of the Court was delivered by

HANDLER, J.

This case presents the question whether an independent contractor that rebuilds part of a machine according to the specifications of the owner can be held strictly liable for injuries sustained by a foreseeable user of the machine when the contractor failed to make the machine safe or to warn of the dangers inherent in its use. The courts below found that such a contractor could not be held strictly liable. We now reverse.

I

Since 1972, plaintiff Eleanor J. Michalko worked as a "molder" for Elastimold in Hackettstown, making airport lighting transformers. Her job consisted of operating a 35-ton vertical transfer or transformer press, soldering wires to coils or cable transformers, and then placing the coils with two small rubber strips in a stationary mold or die positioned on two clamps. The clamps would then be shut by pushing a button on the electric control panel to the right of the operator's station. Once the clamps were closed, rubber strips about five to seven inches long were heated and folded into the injection cavities above and below the stationary die. Upon pressing the injection button on the control panel, the rubber was injected around the coil, and the rams and cylinders would approach the stationary die from the top and bottom. Because the folded rubber sometimes fell

out of the machine, plaintiff had been instructed by her employer to hold the rubber in place with her left hand while she pushed the button with her right. On the evening of December 10, 1973, plaintiff was working on press # 7, observing the normal production procedures and following her employer's instructions. She held the rubber in the cavity with her left hand as usual, as she pressed the injection button with her right. Her left hand got caught between the stationary die and the bottom injection cavity and was amputated. There were no safety devices on the transfer press to prevent the injury.

Elastimold owned four such transfer presses, three of which were originally built by Elastimold's parent company. These were known as presses # 6, 7 and 8. The fourth machine, press # 9, was built by the defendant, Cubby Manufacturing Company (hereinafter "Cubby"), in 1968 in accordance with Elastimold's plans and specifications. Cubby workers had done approximately two dozen jobs for Elastimold since the mid-1960's and had knowledge of the type of work that the transfer presses performed in the manufacturing process.

In 1969 the engineering department at Elastimold drew up plans to rebuild and redesign the three older presses. Elastimold sent Cubby a purchase order, containing a clause requiring Cubby to conform to Elastimold's drawings and specifications. Cubby picked up the machines from Elastimold's plant and transported them to Cubby's shop in Fairfield, New Jersey. The only item left behind at Elastimold after Cubby removed the presses was the old hydraulic system, which was then scrapped. Cubby disassembled each machine. Three of four horizontal plates for the press frame and supporting ties or strain rods from each of the three presses were remachined and reused. Cubby installed eight hydraulic cylinders with accompanying valves, seals, and other paraphernalia. It manufactured a manifold and other parts, and it modified the length of the rams or pistons.

Cubby was aware of the types of safety devices that could be used on the transfer presses. However, it had a policy of not questioning the absence of safety guards when it was not building a complete machine. Cubby knew that assembly drawings usually showed the machine as a finished product ready to operate and that, in this case, the drawings furnished to it by Elastimold did not indicate any safety devices. Even though Cubby's personnel had visited Elastimold and seen the presses operating without safety devices, Cubby assumed that Elastimold would install safety devices itself. It is undisputed that Cubby knew the transfer presses were dangerous without safety devices.

The work performed by Cubby conformed to Elastimold's specifications, which, as noted, did not include provision for a safety device. Moreover, Cubby failed to warn Elastimold or otherwise to convey or affix warnings to foreseeable users that the press was dangerous without a safety device. When the presses were shipped back to Elastimold, they were not operational since Elastimold had decided to install the electrical and hydraulic systems, including the electrical control panel itself. These systems served to give power to the press to make it function. Neither Cubby nor Elastimold installed any safety devices on the presses.[1]

---

[1] In 1969 a number of safety devices might have been used on the transfer press, including gates to keep the operator's hands from entering the machine during operation, a cage mechanism that kept the operator away from the exposed moving parts, and a pilot valve, which would require pressing two buttons rather than one for the press to function, keeping both hands of the operator outside the point of access. For example, press # 9 had the control panel far removed from the cylinder so that it would be quite difficult to keep one's hand on the rubber strips while pressing the button to start the machine.

The type of safety device which was best for a particular machine would vary with the product made on it and the means of using the press. For this reason, manufacturers and vendors would sometimes sell presses to users without safety devices when they did not know the particular work the press would be doing.

Plaintiffs Eleanor Michalko and Paul Michalko filed this action against Cubby, Square D Co., the alleged manufacturer of the control panel, and Cooke Color and Chemical Corp., the supplier of the rubber inserted in the machine. The complaint alleged negligence, strict liability and breach of express and implied warranties on the part of the defendants. Plaintiffs voluntarily dismissed the action against all of the defendants but Cubby.

At the close of the evidence at trial, the trial court dismissed the action against Cubby with prejudice. The trial judge ruled that (1) there was no "sale;" (2) the addition of the hydraulic and electrical systems constituted a "substantial change" in the product, relieving Cubby of liability; (3) Cubby did not design the machine but produced it according to the exact specifications of the employer; (4) it was impractical to install a safety device since different uses of the machine required different devices; and (5) an independent contractor has no duty to warn a knowledgeable buyer that a machine is dangerously designed. The Appellate Division affirmed for substantially the reasons expressed by the trial court. We granted plaintiffs' petition for certification. 88 *N.J.* 476 (1981).

## II

The major issue in this case is whether an independent contractor that undertakes to rebuild part of a machine in accordance with the specifications of the owner has a legal duty to foreseeable users of the machine to make the machine safe or to warn of the dangers inherent in its use.

---

Plaintiffs' expert, Professor Henry Ortiz, testified that the transfer press was not safe for use without some form of safety device. He stated that it was the custom of the trade in 1969 for the manufacturer of a complete press to warn the buyer of the need for a safety device but that such a warning was customarily given only when the manufacturer produced a complete press. If the manufacturer did not install the hydraulic system, it had not made a complete press, and the failure to give a warning in that instance did not deviate from the custom of the trade. In this case, it was Elastimold, not Cubby, that installed the hydraulic system.

■ Under New Jersey law, manufacturers, as well as all subsequent parties in the chain of distribution, are strictly liable for damages caused by defectively designed products. Employees have been allowed to sue the manufacturers of such machines which have injured them during the course of their employment when those instrumentalities lacked either safety devices or adequate warnings. See, e.g., *Freund v. Cellofilm Properties*, 87 *N.J.* 229 (1981); *Suter v. San Angelo Foundry & Machine Co.*, 81 *N.J.* 150 (1979); *Cepeda v. Cumberland Engineering Co.*, 76 *N.J.* 152 (1978); *Finnegan v. Havir Mfg. Co.*, 60 *N.J.* 413 (1972); *Bexiga v. Havir Mfg. Co.*, 60 *N.J.* 402 (1972). See also *Beshada v. Johns-Manville Corp.*, 90 *N.J.* 191 (1982); *Jakubowski v. Minnesota Mining and Manufacturing*, 42 *N.J.* 177 (1964).

■ The elements of a *prima facie* case of strict liability for design defects are proof that (1) the product design was defective; (2) the defect existed when the product was distributed by and under the control of defendant; and (3) the defect caused injury to a reasonably foreseeable user. *Suter*, 81 *N.J.* at 170, 176; *Scanlon v. General Motors Corp.*, 65 *N.J.* 582, 590–91 (1974). See *Santor v. A & M Karagheusian, Inc.*, 44 *N.J.* 52, 66–67 (1965).

■ In a design defect case, the plaintiff has to show that the product design "is not reasonably fit, suitable and safe for its intended or reasonably foreseeable purposes . . ." *Beshada*, 90 *N.J.* at 199, quoting *Suter*, 81 *N.J.* at 169. The determination of whether strict liability applies is made by balancing the magnitude of the risk created by the dangerous condition against the social utility attained by putting the product on the market. *Beshada*, 90 *N.J.* at 199–200. Strict liability attaches if the product's utility is outweighed by the magnitude of the risk involved in its use. *Freund*, 87 *N.J.* at 238 n.1; *Cepeda*, 76 *N.J.* at 172.

■ The focus in a strict liability case is upon the product itself. *Beshada*, 90 *N.J.* at 200; *Freund*, 87 *N.J.* at 238. Knowl-

edge of a product's dangerous characteristics is imputed to the defendant. *Beshada,* 90 *N.J.* at 200; *Cepeda,* 76 *N.J.* at 174–80. It is not necessary to prove that defendant knew or should have known of the harmful attributes of its product while the product was under its control in order to charge it with that knowledge. *Beshada,* 90 *N.J.* at 200; *Freund,* 87 *N.J.* at 242–43. Once the product is deemed dangerous, the defendant's lack of fault is irrelevant. See generally Wade, "On the Nature of Strict Tort Liability for Products," 44 *Miss.L.J.* 825, 834–35 (1973).

These principles apply with similar force to one engaged in rebuilding machines or manufacturing component parts. Under these principles, when it is feasible for the rebuilder of machinery or the manufacturer of component parts to incorporate a safety device and it fails to do so, the rebuilt machine or component part will be deemed to be a defective product when delivered by the manufacturer to its owner. Further, the fact that the product was built according to the plans and specifications of the owner does not constitute a defense to a claim based on strict liability for the manufacture of a defective product when the injuries are suffered by an innocent foreseeable user of the product.

In this case, defendant does not contest the fact that the rebuilt press was a defectively designed product. Rather, it claims that since it was hired to rebuild part of the press to the owner's specifications, it never exerted enough control over the product to be legally responsible for injuries resulting from design defects. See *Scanlon v. General Motors Corp.,* 65 *N.J.* at 591. *Cf. Menacho v. Adamson United Co.,* 420 *F.Supp.* 128, 139 (D.N.J.1976) (as between an original manufacturer and a subsequent rebuilder of a product, liability should be imposed for a defect commensurate with the degree of product control).

We reject this argument. Defendant's lack of responsibility under its contract for the design of the machine is not

relevant. Consequently, its adherence to or reliance upon the owner's plans, even though required by its contract, is equally irrelevant. "It is not necessary to show that defendant created the defect. What is important is that the defect did in fact exist when the product was distributed by and was under the control of the defendant." *Suter,* 81 *N.J.* at 170. See also *Lenherr v. NRM Corp.,* 504 *F.Supp.* 165, 174–75 (D.Kan.1980); *Abdul-Warith v. Arthur G. McKee & Co.,* 488 *F.Supp.* 306, 310–11 (E.D.Pa.1980), aff'd, 642 *F.*2d 440 (3 Cir. 1981); *Greco v. Buccioni Engineering Co.,* 283 *F.Supp.* 978, 980 (W.D.Pa.1967), aff'd, 407 *F.*2d 87 (3 Cir. 1969); *Union Supply Co. v. Pust,* 38 *Colo.App.* 435, 561 *P.*2d 355 (Colo.Ct.App.1976), modified, 196 *Colo.* 162, 583 *P.*2d 276 (Colo.1978).

Defendant relies upon *Sanner v. Ford Motor Co.,* 144 *N.J.Super.* 1 (Law Div.1976), aff'd, 154 *N.J.Super.* 407 (App.Div.1977), certif. den., 75 *N.J.* 616 (1978), in which it was held that a defendant which built a jeep in conformity with contractual specifications supplied by the government was not liable to a plaintiff injured in the jeep because the vehicle lacked seat belts. In *Sanner,* the Law Division held that defendant's duty was limited to complying with the specifications in the contract. 144 *N.J.Super.* at 6–7. The Appellate Division further held that since the government had specifically decided not to include seat belts in the jeep, the manufacturer had no duty to install them. 154 *N.J.Super.* at 410. *Sanner* is distinguishable. Both the Law Division and the Appellate Division rested their holdings on the "conscious, intentional determination by the United States Government that the installation of seat belts would be incompatible with the intended use of the vehicle." 154 *N.J.Super.* at 410; 144 *N.J.Super.* at 6. In this case, however, there was sufficient evidence in the record for the jury to determine that safety devices existed which were compatible with the intended use of the transfer press rebuilt by defendant. Thus, we do not read the *Sanner* decision as standing for the proposition that a

manufacturer is relieved of liability when it produces a machine according to the design specifications of the buyer.[2]

■ Defendant also claims that it is not liable under the test enunciated in *Verge v. Ford Motor Co.*, 581 *F.*2d 384 (3 Cir. 1978). However, that case did not actually address the liability that can be imposed upon the rebuilder of a machine or the manufacturer of a component part of a machine that is defectively designed where there was evidence that the defect existed in the product built by the particular defendant. Defendant cites *Verge* for the proposition that trade custom is a determinative factor relating to responsibility for providing safety devices. In this case, both parties spent a great deal of time at trial trying to demonstrate whether or not defendant complied with the custom of the trade. It appears from the record that the trade custom applicable to defendant was not only not to install a safety device but also not to give a warning. Thus, defendant's conduct was consistent with trade custom. We have repeatedly stated, however, that in this context trade custom is not dispositive of compliance with a legal duty. *Finnegan v. Havir Mfg. Co.*, 60 *N.J.* 413, 422 (1972). A manufacturer may have a duty to install safety devices regardless of whether it was the custom of the trade for the ultimate purchaser to install them. *Bexiga v. Havir Mfg. Co.*, 60 *N.J.* 402, 406–11 (1972). *Cf. Mott v. Callahan Arms Machine Company*, 174 *N.J.Super.* 202, 207–09 (App.Div.1980) (court held that jury question was presented as to "practicality" or feasibility of manufacturer of component part of machine to install a safety device; while citing *Verge,* the court recognized the authority of *Bexiga* that trade custom or practice was not determinative as to a duty

---

[2]*Sanner* is also distinguishable because the contracting party in that case was a governmental entity immune from liability. The Law Division noted that "[t]o impose liability on a governmental contractor who strictly complies with the plans and specifications provided to it by the Army in a situation such as this would seriously impair the government's ability to formulate policy . . . ." 144 *N.J.Super.* at 9. No governmental entity is involved in this case.

upon such a manufacturer to provide safety devices). It is for the Court to determine whether a legal duty will be imposed. In *Freund*, we held that the existence of a duty to make a product safe or to give adequate warning "must be said to attach without regard to prevailing industry standards." 87 *N.J.* at 242–43. See *Ortiz v. Farrell*, 171 *N.J.Super.* 109, 115 (Law Div.1979).

In terms of the basic elements of strict liability for design defects, the evidence adduced at the trial relating to the product built by Cubby is indicative of liability. As already noted, there is no genuine dispute as to the existence of a defect, the lack of a safety device and its origination with the fabrication of the machine components by Cubby. Furthermore, Cubby did exert actual control over the part of the press in which a safety device could have been incorporated. It completely disassembled the press in its own shop, modified existing parts, added new parts, and rebuilt the machine. It is undeniable that the failure to include a safety device in the portion of the machine made by Cubby constituted a defect created while the machine was under its control.

In effect, defendant's position that it did not have control over the press is based upon notions of freedom of contract and the sanctity of contractual obligations. If defendant's argument prevailed, it would leave the determination as to the safety of the product and investment allocation in safety to the private marketplace.

What is even more significant in this case, however, is that plaintiff, an innocent machine operator, was grievously injured because of a private commercial decision not to install a safety device. Unquestionably, it is in the public interest to motivate individuals in the context of commercial enterprise to invest in safety. *Beshada*, 90 *N.J.* at 207. While the commercial market may not always generate a safety stimulus, courts can contribute to that end. A court's ruling on whether to impose a legal duty implicates policy considerations relating to the allocation of costs due to accidents. *Beshada*, 90 *N.J.* at 205.

Furthermore, a result in this case that imposes responsibility—and a continuing incentive—for product safety upon one in defendant's position is not unfair. The question of Cubby's liability for work done at Elastimold's request and under Elastimold's directions is a matter that could have been addressed in the explicit terms of the private contract between the parties. See *Cartel Capital Corp. v. Fireco of New Jersey*, 81 *N.J.* 548, 565–67 (1980). In any event, as between plaintiff, an innocent user of the machine, and Cubby, which rebuilt and remade part of the product without a needed safety device, it is incontestably fairer to impose the cost of the accident on the latter.

Defendant further contends that it cannot be held liable because it did not manufacture a finished product. The transfer press was not complete after Cubby rebuilt it and Elastimold still had to add the electrical and hydraulic systems to make the press operational. Consequently, defendant asserts, the work performed by Elastimold constituted a "substantial change" of the machine after it had been delivered by Cubby. The trial court agreed and ruled that Cubby was not liable because the transfer press underwent a substantial change by Elastimold.

The general rule is that the manufacturer of a component part of a product may be held strictly liable for injuries caused by a defect in that part if the particular part did not undergo substantial change after leaving the manufacturer's hands. See, *e.g., States Steamship Co. v. Stone Manganese Marine Ltd.,* 371 *F.Supp.* 500, 501 (D.N.J.1973); *Greco,* 283 *F.Supp.* at 985: *Pust,* 583 *P.*2d at 281–82; *Suvada v. White Motor Co.,* 32 *Ill.*2d 612, 210 *N.E.*2d 182, 188 (1965); *Dunson v. S. A. Allen, Inc.,* 355 *So.*2d 77, 78–79 (Miss.1978); *Burbage v. Boiler Engineering and Supply Co.,* 433 *Pa.* 319, 249 *A.*2d 563, 566 (1969).

In this case the trial court was mistaken in ruling that the work performed by Elastimold in order to render the press functional constituted a substantial change affecting the portions of the machine that had been rebuilt by Cubby. As noted, Cubby rebuilt the entire machine except for the hydraulic and

electrical systems. The defect in the machine part fabricated by Cubby—the lack of a safety device exposing a moving component which could result in injury to a machine operator—was untouched and remained unaffected by Elastimold's subsequent work upon the machine.

 Even though not a substantial change of the machine components manufactured by Cubby, Elastimold's subsequent work in completing the machine is a relevant circumstance. It is a factor that relates to the element of proximate cause, rather than to the basic duty to furnish a safe product, the breach of which triggers strict liability. Even a significant subsequent alteration of a manufactured product will not relieve the manufacturer of liability unless the change itself creates the defect that constitutes the proximate cause of the injury. *States Steamship,* 371 *F.Supp.* at 505. Thus, if the defect which, singly or in combination, caused the injury existed before, as well as after, the change, the manufacturer is not relieved of liability, regardless of how much the product has been changed. *Id.; Ortiz v. Farrell Co.,* 171 *N.J.Super.* 109 (Law Div.1979). Here, as already noted, the subsequent work undertaken by Elastimold did not alter the defective product made by Cubby.

 Furthermore, the fact that the parties, Cubby and Elastimold, understood that Elastimold would furnish a particular safety device, which the latter then failed to do, also relates to proximate cause. Elastimold's failure in this regard arguably constituted a causal act which contributed to plaintiff's ultimate injury. However, such a combination of causes leading to this industrial accident would not relieve Cubby of liability.[3] See *Freund,* 87 *N.J.* at 245–48. Moreover, Elastimold's subsequent breach of duty would not constitute a defense as a matter of law to plaintiff's strict liability claim against Cubby. See *Finnegan,*

---

[3]We need not in this case decide the issue whether under certain circumstances the subsequent failure by an owner of a machine to provide a particular safety device could constitute a supervening and independent proximate cause of an accident resulting from the lack of such a device.

60 *N.J.* at 423; *Bexiga,* 60 *N.J.* at 410. Consequently, the trial court was in error in concluding that Cubby was not liable as a matter of law because Cubby expected Elastimold to provide a particular safety device, although several were available, and it was "impractical" or inconvenient for Cubby to furnish the safety device.

Cubby makes the additional argument that it cannot be held strictly liable for the defective design of a product because it did not actually sell the machine to Elastimold. We have imposed strict liability in situations involving a combination of sales and services.[4] *Newmark v. Gimbel's Incorporated,* 54 *N.J.* 585, 593–95 (1969); See *Magrine v. Krasnica,* 94 *N.J.Super.* 228 (Law Div.1967), aff'd sub nom., *Magrine v. Spector,* 100 *N.J.Super.* 223 (App.Div.1968), aff'd 53 *N.J.* 259 (1969). See also *Abdul-Warith,* 488 *F.Supp.* at 310–11; *Lemley v. J & B Tire Co.,* 426 *F.Supp.* 1378, 1379 (W.D.Pa.1977). Moreover, we have clearly rejected the requirement that a technical sale occur before strict liability will be imposed. See *Cintrone v. Hertz Truck Leasing & Rental Service,* 45 *N.J.* 434, 452 (1965) (liability imposed even though product was leased rather than sold). Thus, defendant's argument that strict liability cannot be applied in the absence of a "sale" is unavailing.

### III

The next issue in this case is whether an independent contractor has a duty to warn of the dangers of a machine built to the design specifications of the buyer.

---

[4]The arguments for imposing strict liability on the providers of services are three-fold. First, the risk of harm from defective repair services is great, and customers rely on the expertise of the providers of services as much as they rely on the expertise of the providers of products. Second, there is no reason to believe that providers of services are any less able to spread the cost of accidents than suppliers of products. Third, imposing strict liability would induce providers of services to invest in safety, leading to greater protection for their customers and reduced accident costs. See *Newmark v. Gimbel's Incorporated,* 54 *N.J.* 585, 600 (1969); *Raritan Trucking Corp. v. Aero Commander, Inc.,* 458 *F.2d* 1106, 1113–14 (3 Cir. 1972) (applying New Jersey law).

■ This Court has held that a defendant may be held strictly liable for injuries caused by a product which was defectively designed in that it did not contain an adequate warning of the product's dangers. *Beshada,* 90 *N.J.* at 208–209; *Freund,* 87 *N.J.* at 239–41. At the core of our strict liability cases is the requirement that "the risk from the product be reduced to the greatest extent possible without hindering its utility." *Beshada,* 90 *N.J.* at 201. "[I]t is not reasonably safe if the same product could have been made or marketed more safely." *Id.* at 201. A duty to warn of dangers inherent in a product's use arises "because a warning could make [the product] safer at virtually no added cost and without limiting its utility." *Id.* at 201–202, citing *Freund,* 87 *N.J.* at 242.

■ Since a strict liability standard applies, it is not necessary for plaintiff to show that the manufacturer knew or had reason to know that the product was unreasonably dangerous. *Beshada,* 90 *N.J.* at 201–202. Moreover, the duty to provide an adequate warning attaches without regard to prevailing industry standards. *Freund,* 87 *N.J.* at 242–43.

■ Defendant argues that even if it had given a warning, there was no proof that Elastimold would have installed a safety device. Implicated in that argument, however, is the issue of proximate cause. The question whether the failure to warn proximately caused plaintiff's injury is a factual dispute that the jury should decide. A reasonable jury could find that the inclusion of a warning by Cubby would have increased the chances that Elastimold would have added a safety device or taken other measures, such as affixing suitable warnings or giving specific cautionary instructions for the benefit of the operators of the machine to reduce the risk of danger.

Moreover, a proper warning could have been directed to the foreseeable users of the dangerous machine. Such a warning by defendant could have served to put Elastimold's employees on notice of the inherent dangers in using the machine without a safety device. This might have reduced the risk of injury.

Thus, we have held that in some circumstances a manufacturer may have a duty to attach a suitable warning to the machine itself to caution the operator about the danger of using it without a protective device. *Bexiga,* 60 *N.J.* at 412.

Hence, a manufacturer is under a duty to warn owners and foreseeable users of the dangers of using a particular machine if, without such a warning, the machine is not reasonably safe. A manufacturer which does not caution against the dangers inherent in the use of its product should be held strictly liable for injuries resulting from the absence of such warnings.[5]

## IV

In conclusion, we hold that an independent contractor who undertakes to rebuild part of a machine in accordance with the specifications of the owner can be held strictly liable for breach of its legal duty to the machine's foreseeable users to make the machine safe or to warn of the dangers inherent in its use.

Accordingly, we reverse the judgment of the Appellate Division and remand the case for further proceedings in conformity with this opinion.

*For reversal and remandment*—Chief Justice WILENTZ and Justices PASHMAN, SCHREIBER, HANDLER and O'HERN— 5.

OPPOSED—None.

---

[5]Strict liability against Cubby is urged by plaintiffs on grounds of both the failure to warn and the failure to make the product safe. Since it is conceded that Cubby did not provide any warnings to either the owner or the operators of the machine, we need not consider whether such warnings, if given, would otherwise constitute a factual or legal defense to the claim of strict liability based upon Cubby's failure to manufacture or rebuild a safe machine.