201 N.J. Super. 612 (1985)
493 A.2d 647
DAVID GENTILE, A MINOR, BY AND THROUGH HIS PARENTS AND GUARDIANS AD LITEM, VINCENT GENTILE AND JOAN GENTILE, AND VINCENT GENTILE AND JOAN GENTILE, HIS WIFE, INDIVIDUALLY, PLAINTIFFS,
v.
MACGREGOR MANUFACTURING COMPANY, BRUNSWICK CORPORATION, OLYMPIC RECONDITIONING COMPANY, MEDALIST INDUSTRIES, INC., AND BOARD OF EDUCATION OF THE TOWNSHIP OF MOORESTOWN, DEFENDANTS.
Superior Court of New Jersey, Law Division Burlington County.
Decided March 29, 1985.
*613 John A. Miller for plaintiffs (Kenney and Kearney, attorneys).
Michael J. O'Mara for defendants MacGregor Manufacturing Company and Brunswick Corporation (Martin, Crawshaw and Mayfield, attorneys).
Richard J. Jubanyik for defendant Olympic Reconditioning Company (Jubanyik, Varbalow, Tedesco and Shaw, attorneys).
Marc L. Hurvitz for defendant Medalist Industries, Inc. (Horn, Kaplan, Goldberg, Gorny and Daniels, attorneys).
*614 GOTTLIEB, J.S.C.
Plaintiff was injured while participating in an inter-scholastic football game. Along with his parents, he filed an action against the Moorestown Township Board of Education (the board) for the negligent coaching techniques of its coaches. They also sued the manufacturers of the football helmet he was wearing and two subsequent reconditioners of the helmet, under the legal theories of breach of warranty and strict liability. The two reconditioners, Olympic Reconditioning Company (Olympic) and Medalist Industries, Inc. (Medalist), have each moved for summary judgment under R. 4:46. I conclude that both applications must be granted as to breach of warranty, but denied as to strict liability as a matter of law.
The facts relevant to these motions are as follows:
On October 22, 1979, plaintiff sustained severe injuries in a football game when he used his head as the initial point of impact in attempting to tackle a ballcarrier on an opposing team. The helmet was manufactured by defendants Brunswick Corporation (Brunswick) and MacGregor Manufacturing Company (MacGregor) in 1972. It was then sold to the board, which supplied it for the use of its student football players. Each year thereafter the board sent the equipment to a reconditioning company for repair and post-season storage. The reconditioning process consisted of inspection of the helmet, replacement of broken parts from spare parts supplied by the manufacturer, repainting (if requested), cleaning and sterilization.
A label inside the helmet worn by plaintiff indicated that it was "reconditioned for the 1975 playing season" by Medalist. A second label inside that helmet advised: "CAUTION: Serious neck or head injury can result while playing football despite our efforts to protect the individual. OLYMPIC RECONDITIONING COMPANY." Olympic reconditioned football helmets for the board before the 1977, 1978 and 1979 playing seasons. The manufacturers never placed any warning in the helmet.
*615 For purposes of these motions, both reconditioners concede that the lack of an effective warning made the helmet worn by plaintiff "not reasonably fit, suitable and safe for its intended or reasonably foreseeable purpose." Suter v. San Angelo Foundry & Machine Co., 81 N.J. 150, 169 (1979). Thus the helmet was defective. However, movants contend that since they merely refurbished  as opposed to remanufactured  the helmet, they cannot be responsible to plaintiff under either a breach of warranty or a strict liability theory of recovery. No claim grounded in negligence has been advanced against them.
Essentially, Olympic and Medalist submit that since they did not create or expand a product which then was placed in the stream of commerce, but merely serviced an existing product, they are not sellers or remanufacturers. Reasoning that each status is a factual requisite to the two respective causes of action, they urge entitlement to summary judgment as a matter of law. I shall discuss each cause of action in turn.

I

BREACH OF WARRANTY
Plaintiff alleges breaches both of express and implied warranties. The express warranty is one which is said to exist under N.J.S.A. 12A:2-313(1) which provides:
Express warranties by the seller are created as follows: (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
The board, as set forth on the voucher ordering the service, requested that the reconditioners "recertify NOCSAE [National Operating Committee for Standards of Athletic Equipment] helmets." The direction to recertify became a part of the contract between the board and the reconditioners as a consequence of their acting on the voucher. If, in fact, NOCSAE standards were not met, then there was a breach of an express warranty.
*616 The implied warranty is one of fitness "for the ordinary purposes for which the goods are used." N.J.S.A. 12A:2-314(2)(c). There is no dispute that a football helmet is used for its "ordinary purpose" when worn while playing football. Nor is there any challenge to the contention, at this point, that the helmet was not fit for that use since, as noted previously, the reconditioners concede that it was defective.
The crucial question is whether the reconditioners are sellers under a proper interpretation of the law governing warranties. N.J.S.A. 12A:2-106(1) defines a sale as "consist[ing] in the passing of title from the seller to the buyer for a price." While the reconditioners may have supplied certain replacement parts, that aspect of their task was merely incidental to the predominant service nature of the transaction. The helmet was and continued to be owned by the board; no passing of title occurred; thus there was no sale.
The courts of this State have not yet disregarded the need to have a sale, a transfer of goods, in order to call into play the warranty provisions of the Uniform Commercial Code. See Heavner v. Uniroyal, Inc., 63 N.J. 130 (1973):
The meaning is plain that the provisions of the sales chapter of the Code are not intended to apply to actions for consequential personal injury and property damages except where the suit is between a buyer, or the limited additional class of beneficiaries, and the immediate seller, and even then, only on the basis of a "warranty" in the commercial sales sense as provided for in the chapter. [at 154]
I am mindful of Newmark v. Gimbel's Inc., 54 N.J. 585 (1969). That case involved a claim of breach of express and implied warranties by a beauty parlor operator who gave a permanent wave to a patron. The patron's hair and scalp were injured by the product used. The Supreme Court characterized that transaction as "a hybrid partaking of incidents of a sale and a service." Id. at 593. Reasoning that if the permanent wave solution had been self-applied and injury resulted a breach of warranty action would lie, the Court concluded that it would be illogical to deny a similar right where the transaction anticipated *617 the use of the product through the beauty parlor operator. Ibid. The Supreme Court noted that "in the modern commercial world the liability of a manufacturer or a retail seller of a product should not be made to depend strictly upon the intricacies of the law of sales" and that "there is no sound reason for restricting implied warranties of fitness to conventional sales of goods." Id. at 594. Nonetheless, in reflecting on the transaction involving the servicing of the helmet, it becomes readily apparent that the claim of breach of warranties arises not out of any supplying of a product (replacement parts), but on the failure of the reconditioners to supply a helmet which had the status of being "safe."[1] The fact that there may have been a product supplied in the course of the reconditioning process is totally irrelevant to the claim of breach of warranties asserted by this plaintiff.
Nor, in that light, is there a need to expand the Uniform Commercial Code to cover pure service transactions within the scope of a sale. The basis for this statement requires a cursory review of the history of the development of the pertinent law, beginning with negligence, progressing through breach of warranty and culminating in strict liability. Negligence sparked the development of breach of warranty, see Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 371-372 (1960), and it, in turn, gave birth to strict liability. See Santor v. A & M Karagheusian, Inc., 44 N.J. 52, 64-65 (1965).
Negligence, the original cause of action, is a theory of liability based upon the failure of someone to live up to a duty to act in a reasonable manner toward another which results in harm to that person. See Sanzari v. Rosenfeld, 34 N.J. 128, 134 (1961). However, litigations confined to a negligence theory of *618 recovery often yielded unsatisfactory results because of the burdens of proof and the defenses available under this cause of action. Specific examples of these hurdles to recovery include the burden on the plaintiff to establish the standard of care, plaintiff's obligation to show the nature of defendant's conduct, lack of privity, lack of foreseeability and knowledge of the defect, plaintiff's own negligence and assumption of risk. To avoid some of these problems of proof and the several negligence defenses, the courts began to develop breach of warranty as an alternative theory of liability. In implementing this the courts restricted the privity defense, Henningsen v. Bloomfield Motors, Inc., supra, 32 N.J. at 413, limited the ability to disclaim a warranty and eliminated the need to prove negligence or knowledge of the defect. Id. at 372.
Nevertheless, certain unjust results continued to flow from suits instituted under a breach of warranty theory of liability because certain contractual defenses concerning notice and reliance remained available. Consequently, a shift from the contractual underpinnings of warranty to that of strict liability in tort transpired. Thus, in Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (Sup.Ct. 1963), it was first held that a plaintiff need not rely upon a warranty breach to have liability imposed. Rather, "a manufacturer is strictly liable when an article it places on the market, knowing it is to be used without inspection for defects, proves to have a defect that causes injury." The law of strict liability developed into its present form from the basic principles enunciated in Greenman. See Santor v. A & M. Karagheusian, Inc., supra 44 N.J. at 65-66.
With this summary of development in mind, it is apparent that a cause of action for strict liability renders superfluous one for breach of warranty. Its remedy is as inclusive and all-encompassing as that under warranty. Furthermore, the obligations of proof imposed on plaintiff are less burdensome and the available defenses are more limited. That being so, there is no need to augment one's rights under the Uniform Commercial *619 Code by including the provider of a pure service within the concept of a sale. Indeed, in the context of a trial, such action might only serve to make more complex the issues to be resolved. "No advantage can be gained by pleading [causes of action] in terms of breach of warranty, express or implied. When the gravamen is a defect in the article and consequential personal injury and property damages are sought, they will be taken for what they actually are, no matter how expressed." Heavner v. Uniroyal, Inc., supra 63 N.J. at 156. If there is no valid reason to do something, it ought not be done.
Accordingly, I decline to extend an action for breach of warranty to a situation where there is no sale of goods. Summary judgment seeking dismissal of this claim is granted.

II

STRICT LIABILITY
There have been no reported decisions in this State which have determined whether the services of an existing product can be responsible for a preexisting defect under strict liability. Nonetheless, strong guidance in deciding the question is provided in Michalko v. Cooke Color and Chem. Corp., 91 N.J. 386 (1982). There, the Supreme Court held that an independent contractor that rebuilds part of a machine supplied to it by an owner in accordance with the owner's specifications has a legal duty to either make the machine safe or to warn of dangers inherent in its use. It rejected a claim that the independent contractor never exercised sufficient control over the product as legally irrelevant. Referring to and quoting from Suter v. San Angelo Foundry and Machine Co., supra, the Court iterated its view that who created a defect is immaterial. So long as the defect existed when it was under the control of and distributed by a defendant, strict liability may apply. Michalko, supra, 91 N.J. at 396.
Moreover, Michalko advises that strict liability will exist in situations involving a combination of sales and service. Id. at *620 401. In discussing the bases for concluding that it is appropriate to impose responsibility on service providers, the Supreme Court observed:
First, the risk of harm from defective repair services is great, and customers rely on the expertise of the providers of services as much as they rely on the expertise of the providers of products. Second, there is no reason to believe that providers of services are any less able to spread the cost of accidents than suppliers of products. Third, imposing strict liability would induce providers of services to invest in safety, leading to greater protection for their customers and reduced accident costs. [Id. at 401, n. 4].
While they recognize the holding in Michalko, the reconditioners contend that it ought not to be extended to control the present case. They submit that there is a vital distinction: they never changed the basic structure of the helmet. They point out that no court has ever held that a provider of services alone, as distinguished from a provider of a product or a hybrid provider of services and product, can be found liable under a strict liability theory. The reconditioners urge that if any responsibility is to be incurred by them, it should be based on negligence alone.
The weakness in this position is that movants fail to recognize that they are not mere servicers of athletic equipment. They are experts in the condition of athletic equipment; the board contemplated that they would use that expertise while inspecting the entirety of the helmet to determine the propriety of its continued usefulness. Indeed, the facts indicate that it was a basic procedure of the reconditioners to return unserviced any helmets which appeared to be unsafe because of damage. It is not meaningful to assert that there is a difference between an inspection to determine safety based solely on the extent of damage to a helmet and an inspection to determine safety based on the overall status of the helmet as a safe helmet. The board relied upon the expertise of the reconditioners to make valid judgments on the all-embracing safety status of the helmet. This conclusion is reinforced by the voucher directive to "recertify NOCSAE helmets." The board did not request a mere mechanical servicing of the helmet; it asked for *621 the exercise of expertise dealing with the overall safety of the helmet.[2] The reconditioners reasonably should have been aware that their expertise was being called upon in this regard.[3]
The defective nature of the helmet illustrates that reliance on the reconditioners did not result in fulfillment of the expectations regarding the exercise of their expertise. Accordingly, there is no reason to conclude that a strict liability cause of action does not exist. Like the manufacturer, the reconditioners were in a position to control the danger arising out of the defect. Like the manufacturer, the reconditioners represented the goods as being safe to use. Unlike the supplying of professional services, where because of the individuality of the service rendered, see Union College v. Kennerly, Slomanson & Smith, 167 N.J. Super. 311, 317 (Law Div. 1979), strict liability generally is not applied, see Magrine v. Krasnica, 94 N.J. Super. 228 (Cty.Ct. 1967), aff'd sub. nom. Magrine v. Spector 100 N.J. Super. 223 (App.Div. 1968), aff'd 53 N.J. 259 (1969), and La Rossa v. Scientific Design Co., Inc., 402 F.2d 937 (3 Cir.1968), the reconditioners dealt with a significant volume of helmets which were then reintroduced into the arena of use.
*622 The policy underlying strict liability, stated quite simply, is to provide that the cost of injury or property damage is borne not by the injured or damaged person who is unable to protect himself or herself, but by those who create the opportunity for a defective product to be used. Certainly, in light of this, it makes no sense to apply strict liability to a manufacturer who presents goods for use along with a representation of their safety and not to impose similar responsibility on a reconditioner who retenders goods for use along with a representation of their safety.
Accordingly, the motion for summary judgment regarding the cause of action for strict liability is denied.
NOTES
[1] In seeking to have a warranty imposed on this transaction which essentially contemplated the supplying of services, what in reality is sought is "no more than a `warranty' that the performer would not act negligently." Milau Assoc., Inc. v. No. Ave. Devel. Corp., 42 N.Y.2d 482, 398 N.Y.S.2d 882, 886, 368 N.E.2d 1247, 1251 (Ct. of App. 1977).
[2] The board's reliance upon the reconditioner's expertise distinguishes this case from Dixon v. Four Seasons Bowling Alley, Inc., 176 N.J. Super. 540 (App. Div. 1980). Dixon dealt with whether strict liability may be imposed in a commercial setting on one who provides personal property for a business invitee's use. The court concluded that a bowling alley proprietor was not liable to a patron injured by an allegedly defective bowling ball partially for the reason that the patron did not rely on the proprietor's expertise in electing to use the ball. However, here, there was reliance on the reconditioners' representations of safety.
[3] A reasonable factual argument could be made that the scope of the reconditioners' tasks did not include ascertaining and verifying the over-all safety status of the helmet. However, on these motions for summary judgment, the similarly reasonable factual conclusion which is most advantageous to plaintiff, against whom the motions are made, is selected. "All inferences of doubt are drawn against the movant in favor of the opponent of the motion." Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 75 (1954).