BERNADETTE C. WASKO, ET ALS., PLAINTIFFS, v. R.E.D.M. CORPORATION, ET ALS., DEFENDANTS.

Superior Court of New Jersey
Law Division Somerset County

Decided June 11, 1986.

*Alfred A. Levinson* for plaintiffs Kochon, Hermann and Crespo (*Levinson, Conover, Axelrod, Wheaton & Grayzel,* attorneys).

*Christopher R. Wood* for plaintiffs Wasko, Schaefer and Madsen (*Rafano & Wood,* attorneys).

*Thomas F. Campion* and *Susan M. Sharko* for defendant R.E.D.M. Corp. (*Shanley & Fisher,* attorneys).

ARNOLD, J.S.C.

In this strict liability and negligence action, based on an allegation of failure to warn of the dangers of a product, defendant requests that the court instruct the jury concerning the "knowledgeable user" defense. Specifically, defendant requests this court to instruct the jury that the supplier of a dangerous product has no duty to warn a "knowledgeable user." Under the facts of this case, the court adopts such a

defense because the entire class of users of the product are skilled professionals or otherwise "knowledgeable users," despite New Jersey's apparent rejection of the doctrine in *Campos v. Firestone Tire & Rubber Co.*, 98 *N.J.* 198 (1984).

This is a wrongful death and personal injury action brought on behalf of the estates of four soldiers and two living soldiers who were killed or injured in an explosion at Fort Dix, New Jersey on March 17, 1983. These soldiers were disposing of detonators and rotor body assemblies containing detonators shipped by defendant, R.E.D.M. Corp., to the United States Army. They were in the process of preparing the detonators and rotor body assemblies for demolition when the explosion occurred and they were killed or injured. All of the men were members of the 60th Explosive Ordnance Disposal Unit which was stationed at Fort Dix.

Defendant is in the business of assembling M-739 fuzes for the United States government. An M-739 fuze is a bullet shaped cylindrical object tapering to a point with a nontapered end threaded so that it can be screwed into the head of an artillery round. It contains a complex triggering mechanism for exploding the charge within the artillery round. This triggering mechanism includes a safe and arming device which contains a rotor body assembly containing an M-55 detonator. These M-55 detonators, which are supplied to R.E.D.M. by the Department of Defense in boxes containing 50 detonators, are very sensitive. All the other parts of the rotor body assembly are made by subcontractors. Defendant assembles the various parts and the M-55 detonators to build the rotor body assemblies.

A small percentage of rotor body assemblies fail final inspection for several reasons. Some may have defective gearing. In others, the M-55 detonator may have been placed in the assembly backwards or sideways so that it is distorted or fractured. After several years of manufacturing M-739 fuzes, defendant had accumulated a substantial number of defective rotor body

[redacted]

assemblies. In addition, defendant had accumulated a substantial number of boxes of M–55 detonators which, although not assembled in rotor body assemblies, had to be destroyed. A box of M–55 detonators is considered defective if inspection reveals a single defective detonator in a box received from the government. Furthermore, defendant had accumulated a large number of defective fuzes. All these defective items had to be destroyed and pursuant to an agreement with the government they were sent to the 60th Explosive Ordnance Disposal Unit at Fort Dix, New Jersey to be destroyed.

"Explosive Ordnance Disposal" ("EOD") is defined by the United States Army as the

> detection, identification, field evaluation, rendering safe, recovery and final disposal of unexploded explosive ordnance. It may also include the rendering safe and/or disposal of explosive ordnance which have become hazardous by damage or deterioration when the disposal of such explosive ordnance is beyond the capabilities of personnel normally assigned responsibility for routine disposal.

The training for the EOD branch of the Army is highly technical and very comprehensive. EOD training begins at Red Stone Arsenal, Alabama, where each soldier undergoes instruction in biological and chemical munitions. Candidates then go on to the naval EOD school in Indian Head, Maryland for training in conventional ordnance including an in-depth training program on explosives, safety precautions, and handling and use of explosives. The course then covers more complex munitions including training on how to recognize and perform operations with them. Finally, there is a program in nuclear weapons. After successful completion of this basic EOD training, a soldier becomes EOD qualified. Training also continues in an EOD unit on a day-to-day basis. In addition, every two years all units are required to go to the Red Stone Arsenal, Alabama, for a unit refresher course. Furthermore, individual soldiers are required to undergo refresher training.

Before the defective explosive devices were shipped to the 60th EOD, Sgt. James K. Offenbecher of that unit went to defendant's plant to inspect the items which would be sent to

the 60th EOD. The explosive devices were contained in boxes and crates strapped to pallets, but the strapping was cut so that Sgt. Offenbecher could make an inspection. He was given a list of the explosive devices contained on each pallet.

On March 15, 1983 the six pallets of explosive devices arrived safely at Fort Dix from defendant's plant in northern New Jersey and destruction of the defective devices began the next day. By early afternoon March 17, 1983, members of the 60th EOD had successfully destroyed all of the defective explosive devices except the rotor body assemblies and the M–55 detonators. Defendant had packaged the rotor body assemblies in plastic trays divided into compartments. These trays are called "candy dishes" because of their strong resemblance to the plastic trays found in most boxes of candy. The plastic trays with a rotor body assembly in each compartment were packed in cardboard cartons for shipment. The defective M–55 detonators themselves were still contained in the original boxes that had been used to ship them to defendant. According to the testimony, the EOD soldiers determined that the way to dispose of these devices was by use of a so called "shot box." This was a wooden box approximately a foot long, nine inches wide and several inches high lined on the bottom with plastic explosive. It was their intention to load the rotor body assemblies and boxes of M–55 detonators into the shot box, place the shot box in a hole in the ground and explode the plastic explosive by means of a delay time fuse so that all could retreat to a safe location before the explosion. The EOD soldiers first put plastic explosive in the bottom of the "shot box." They then began unloading the plastic trays from the cartons and started taking rotor body assemblies from the trays and putting them in the shot box. There has been testimony that some soldiers took one rotor body assembly from a plastic tray at a time while others handled several at a time. Boxes of M–55 detonators were also put in the shot box. After the box was about one-third filled with rotor body assemblies and boxes of detona-

tors, and while the soldiers were still loading the shot box, the fatal explosion took place.

Plaintiffs allege, among other things, that defendant is strictly liable because the packaging of the rotor body assemblies was not accompanied by adequate warnings or instructions. In addition, plaintiffs allege that defendant was negligent in failing to provide adequate warning or instructions. Defendant urges this court to charge the "knowledgeable user" defense with respect to these allegations.

A supplier of a product is under a duty to warn users of the dangers of using the product if, without such a warning, the product is not reasonably safe. A supplier who does not warn against the dangers inherent in the use of its product is strictly liable for injuries resulting from the absence of such warning. *Michalko v. Cooke Color & Chem. Corp.*, 91 *N.J.* 386 (1982); *Freund v. Cellofilm Properties, Inc.*, 87 *N.J.* 229 (1981). However, the greater weight of authority supports the proposition that there is no duty to warn in either strict liability or negligence actions where the party to be warned is already aware of the dangers and a warning would serve no useful purpose. *Strong v. E.I. Dupont deNemours, Co., Inc.*, 667 *F.* 2d 682 (8 Cir.1981); *Billiar v. Minnesota Mining & Mfg. Co.*, 623 *F.*2d 240 (2 Cir.1980); *Martinez v. Dixie Carriers, Inc.*, 529 *F.*2d 457 (5 Cir.1976); *Madrid v. Mine Safety Appliance Co.*, 486 *F.*2d 856 (10 Cir.1973). This proposition, or defense is called the "knowledgeable user" defense.

The majority opinion of the Appellate Division in *Campos v. Firestone Tire and Rubber Co.*, 192 *N.J.Super.* 251 (App.Div. 1983), rev'd 98 *N.J.* 198 (1984), appeared to adopt the "knowledgeable user" defense. Campos was injured while inflating a truck tire on a Firestone rim assembly. Just before the accident, he had assembled a tire on a three-piece truck rim. After placing the tire and rim assembly into a steel safety cage he began inflating the tire. The purpose of the safety cage was to prevent the metal rim components from striking anyone in the event the rim components separated under pressure during

inflation. Separation under pressure could occur if the rim parts were defective or not properly assembled by the mechanic. In addition to the safety cage, Campos used a clip-on air chuck. The purpose of this clip-on air chuck was to permit tire mechanics to stand away from the steel safety cage during inflation, another safety precaution from rim separation. While inflating the tire, Campos saw the lock-ring component of the rim assembly separating, that is, "coming out." He reached inside the steel cage and his right hand and arm were injured when struck by the lock-ring. Campos admitted that he knew such conduct was dangerous and that the separation under pressure could cause serious injury. Moreover, six years before, Campos had been injured at work in much the same way when he reached inside a safety cage during inflation of a tire and rim assembly. After the first accident he had been reinstructed in use of the safety cage and the clip-on air chuck and was told specifically by his superior to "stand back" while inflating a tire.

Campos was an experienced tire mechanic who had changed eight truck tires an hour, eight to ten hours a day, six days a week for over seven years. He knew the procedures for safety during inflation: assembly in the steel safety cage, use of the clip-on chuck and standing away from the cage. However, Campos was illiterate in both English and his native Portugese. There were no written or pictorial warnings about the dangers of reaching into the cage on either the tire rims or on the safety cage. Campos' safety expert theorized that some type of international graphic symbol could have been used by Firestone to portray the dangers of putting one's arm in the safety cage when separation was imminent.

In response to two special questions, the jury found no design defect but did find that Firestone did not adequately warn of the product's potential dangers. Campos was awarded a verdict of $255,000 for injuries to his arm. The key issue on appeal was whether Firestone violated any legal duty to Campos to warn of the product's danger. The majority opinion of

the Appellate Division held that Firestone breached no duty to warn of the dangers involved in the use of the rim assembly to inflate a truck tire because Campos was a skilled, experienced tire mechanic who knew the safety procedures involved. Judge Dreier dissented, opining that the duty to warn is not imposed as to a particular user depending on his or her sophistication but rather as to the class of users. On appeal, the Supreme Court reversed implicitly rejecting the "knowledgeable user" defense, and adopting a risk-utility analysis to be used in deciding whether a manufacturer has a duty to warn. *Campos v. Firestone Tire & Rubber Co., supra,* 98 *N.J.* at 207. However, a close analysis of the opinion of the Supreme Court reveals that the Court adopted Judge Dreier's dissent insofar as he noted that the duty to warn is not imposed as to a particular user depending on his or her sophistication but rather as to the class of users. In holding that Firestone had a duty to warn, the Supreme Court noted that tire assembly work is usually done by unskilled workers, and that Campos' knowledge as a skilled worker was relevant only on the issue of causation. Accordingly, the implicit rejection of the "knowledgeable user" defense by the Supreme Court must be limited to a rejection of the defense in situations where the particular user but not the class of users is a "knowledgeable user." Therefore, this court adopts the defense in its narrow application to a class of users.[1]

In this case the entire class of users constituted the 60th EOD. There were no other users for this particular product. All were highly trained professionals. Because the entire class of users of the product were skilled professionals, the "knowl-

---

[1]In *Merklin v. United States,* 788 *F.*2d 172 (3 Cir.1986) the Court of Appeals stated: "Although the New Jersey courts have not considered this doctrine ["knowledgeable user" defense] we are confident that they would adopt it. *Cf. Campos v. Firestone Tire & Rubber Co.,* 98 *N.J.* 198, 208 (1984) (doctrine does not apply in strict liability action when work is unskilled or semi-skilled)." Nevertheless, this court declines to adopt the "knowledgeable user" defense broadly, although a majority of the courts seem to have broadly adopted it. *Horak v. Pullman, Inc.,* 764 *F.*2d 1092, 1097 (5 Cir.1985).

edgeable user" defense is applicable and the jury will be charged that in considering defendant's duty to warn, defendant has no duty to warn "knowledgeable users." "Knowledgeable users" will be defined in the charge as skilled persons who are experienced in the handling of the product and who possess an understanding of the product and its inherent risks.

■ Alternatively, it should be noted that under the risk-utility analysis set forth by the Supreme Court in *Campos, supra,* 98 *N.J.* at 207–208, there was no duty to warn. There was no duty to warn under a risk-utility analysis because: the packages of explosives were not a product which had been placed in the stream of commerce as they were shipped only to the 60th EOD; the dangers to plaintiffs were basic to the function or purpose of the product, and the absence of a duty to warn would not encourage manufacturers to eliminate warnings or to produce inadequate warnings.

Accordingly, this court will instruct the jury regarding the "knowledgeable user" defense as requested by defendant.