John ARCENEAUX, Rose Arceneaux
and Texas Employers Insurance
Association, Appellants,

v.

LYKES BROS. STEAMSHIP CO.,
INC., et al., Appellees.

No. 09–93–089 CV.

Court of Appeals of Texas,
Beaumont.

Submitted Sept. 8, 1994.

Decided Dec. 8, 1994.

Richard Schechter, Houston, Woodson E. Dryden, Dryden, Watson, Grossheim & Jamail, Beaumont, for appellants.

Robert Keith Drummond, Strasburger & Price, Dallas, Richard E. Hanson, Brown, Sims, Wise & White, Houston, P. Michael Jung, Strasburger & Price, Dallas, William M. Tolin, III, Hubert Oxford, III, Benckenstein & Oxford, Beaumont, for appellees.

Louis M. Scofield, Jr., Mehaffy & Weber, Beaumont, for intervenor.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

WALKER, Chief Justice.

This is a maritime personal injury action. On January 21, 1985, John Arceneaux was a longshoreman working aboard the S/S JOSEPH LYKES when he fell forty feet from a ladder to the deck below. The S/S JOSEPH LYKES was owned, operated, and manned by appellee LYKES BROTHERS STEAMSHIP CO., INC., hereinafter referred to as LYKES. The subject vessel was originally built by appellee LITTON SYSTEMS, INC., formerly known as INGALLS SHIPBUILDING CORPORATION, hereinafter referred to as INGALLS. Mr. Arceneaux sustained permanent serious injuries as a result of this fall.

John Arceneaux and his wife Rosemary ultimately instituted a lawsuit against LYKES, INGALLS and Gibbs & Cox. The Arceneauxs non-suited Gibbs & Cox. Texas Employers Insurance Association, workers' compensation insurer of Arceneaux's employer, intervened. Following substantial discovery, defendants filed motions for summary judgment. The trial court initially denied

INGALLS' first two motions for summary judgment, however, ultimately the court granted both INGALLS' and LYKES' motions for summary judgment. Plaintiffs now appellants, and Intervenor timely perfected this appeal contending that the trial court erred in granting both LYKES' motion for summary judgment and INGALLS' motion for summary judgment.

Factually, on January 21, 1985, John Arceneaux was employed by Ryan Walsh Stevedores as a longshoreman. On that date Mr. Arceneaux was assigned to the S/S JOSEPH LYKES, a vessel owned, manned, and operated by LYKES. Mr. Arceneaux was working in cargo hold No. 3 along with several other longshoremen who were engaged in the loading of 140 pound sacks of flour into the vessel. These longshoremen worked eleven hours loading sacked goods on the vessel. Upon completion of their day's work these longshoremen ascended one of the hatch ladders in order to return to the main deck of the vessel. Mr. Arceneaux was the last man up the ladder. The ladder which the longshoremen ascended was not the usual type ladder in that it was not a vertical ladder. Instead of being straight up and down, the ladder had bends in two places that required climbers to literally reach back over their head to climb up. This offset required a climber to lean back and bear most, if not his entire weight with his arms while traversing the offset. Evidence presented by both lay and expert witnesses revealed that such ladders are significantly harder to climb than vertical ladders or ladders with a forward incline.

Cargo hold No. 3 has three access ladders, two of which are offset ladders and the other, being a primary access ladder. This primary access ladder was inaccessible to longshoremen at the time Mr. Arceneaux was exiting cargo hold No. 3, in that the hatch cover for this interior ladder on the main deck was closed. It is undisputed that at the time of Mr. Arceneaux's fall, the stevedore had control of the ship's cargo work area. The ship's crew and officers were not involved in the cargo operations.

Mr. Arceneaux successfully traversed the first offset and almost made it to the top of the ladder. The second offset is located from four to eight rungs below the top. When Mr. Arceneaux reached the second offset, he could not climb any further. It was at this point that he apparently attempted to retreat and get off the ladder at the 'tween deck located about ten feet below. Mr. Arceneaux was able to back down a couple of rungs before losing his grip and falling forty feet to the steel deck below. This fall and resulting injuries rendered Mr. Arceneaux unconscious for 13 or 14 days, whereby he sustained massive injuries and incurred medical expenses of almost $150,000. Mr. Arceneaux's deposition testimony revealed that he had used the ladder without incident on two earlier occasions that same day.

## DESIGN HISTORY OF S/S JOSEPH LYKES

In the mid–1950's LYKES determined to build a new class of bulk cargo commercial vessels to engage in foreign trade. LYKES contracted with Gibbs & Cox, a New York naval architectural firm to take LYKES' broad concept and developed more specific designs and specifications. Subsequent to Gibbs & Cox development of the general design and specifications, the Federal Maritime Board which paid a construction subsidy,[1] approved them. The plans were then put out for bids. INGALLS SHIPYARD in Pascagoula, Mississippi, was the low bidder. On January 28, 1958, LYKES, INGALLS, and the Federal Maritime Board, signed a contract approving construction of five vessels pursuant to various plans and specifications. One of these five vessels ultimately became the S/S JOSEPH LYKES.

INGALLS, having won the bid, began to prepare detailed drawings for construction. The plans and specifications prepared by Gibbs & Cox and approved by LYKES and the Federal Maritime Board were inadequate for actual construction. The actual construc-

1. In order to encourage vessel owners to build in America, the Federal Government subsidized the construction of new ships by paying the differ-ence between construction costs in foreign yards and those in American yards.

tion of the S/S JOSEPH LYKES took approximately two years, entering commerce in the early 1960's.

## DESIGN HISTORY OF
## OFFSET LADDER

The original written specifications for the S/S JOSEPH LYKES call for rotating or pivoting ladders in the vessel's holds, not offset ladders. A pivoting ladder pivots around one of its legs which allows it to be moved out of the way. The pivoting leg is simply pushed 90 degrees from its ordinary position and pinned in place. The ladder is stored until it is needed for use. When needed for use, the ladder is re-pivoted into position and pinned in place, where it forms a vertical ladder. Summary judgment evidence before the trial court indicated that the pivoting ladder had been used for years prior to 1958, with no problems. Appellee LYKES determined that it wanted a different type of ladder and either LYKES or Gibbs & Cox developed a rough sketch of an offset ladder. This design was then presented at an engineering meeting attended by LYKES, Gibbs & Cox, INGALLS, and Federal Maritime Board employees. It was at this meeting that LYKES suggested the placing of offset ladders in all hatches whose specifications call for pivoting ladders. According to our summary judgment record, INGALLS' employees warned LYKES that this new design was unsafe, such advice being rejected by LYKES which insisted on the use of offset ladders. There is summary judgment evidence suggesting that INGALLS designed the offset ladder ultimately used in the vessel.

Some misunderstanding arose between Gibbs & Cox and LYKES concerning the final design of the offset ladders. LYKES preferred a design whereby the slope of the ladders would be gradual, whereas the Gibbs & Cox design called for a more pronounced slope nearer to the hatch opening. The Gibbs & Cox design was ultimately used in the three cargo holds where hydraulic hatch covers were involved.

In 1971, the S/S JOSEPH LYKES was "jumboized," a process whereby the ship was cut in half and a new middle section con-

structed. The design engineering for the jumboizing operation was performed by Designers and Planners of Galveston, Texas, an affiliate of Todd Shipyard, also of Galveston, where the actual construction work was performed. As part of the jumboizing, hydraulic hatch covers were installed in cargo hold No. 3, necessitating a change from the original vertical ladders installed by INGALLS in 1958–60. Designers and Planners or Todd Shipyard or both, chose to copy and modify the prior offset ladder design for use in cargo hold No. 3. Todd Shipyard then manufactured the ladder.

## SUMMARY JUDGMENT RECORD

■ The only party to this appeal taking issue with the procedural aspects of the summary judgment proceeding below is appellee INGALLS. The summary judgment record consists of deposition transcripts, interrogatory answers, other discovery responses referenced or set forth in motions or responses, pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, on file at the time of the hearing or filed thereafter with permission of court prior to entry of judgment. Basically, the summary judgment evidence consisted of various exhibits which the parties referenced in their motions and responses, as well as a stipulation and several sets of admissions which were on file at the time of the summary judgment hearing. The stipulation appears of record, although certain of the contents referenced in the body of such stipulation are not among the exhibits which accompany said stipulation in the transcript. Example: One set of admissions where appellee LYKES responds to plaintiffs' request appears in this transcript. However, five other sets of admissions which include Gibbs & Cox responding to plaintiffs' request; Litton responding to plaintiffs' request; INGALLS responding to plaintiffs' request; Litton responding to LYKES' request; and plaintiffs responding to Litton's request, have not been included in the transcript.

In this Court, both appellants and appellees rely on deposition transcripts and other materials attached to their earlier motions and responses to motion for summary judg-

ment same having been denied by the trial court and same not being technically before the trial court on later motions.

Because all parties, including INGALLS, engaged in the complained-of practice, we will consider all appropriately referenced summary judgment evidence wherever appearing in the transcript so long as it is a part of either current or prior summary judgment motions or responses.

## SUMMARY JUDGMENT FAVORING INGALLS

■■■ The granting of a motion for summary judgment is proper only where the movant establishes, as a matter of law, that there is no genuine issue of fact with respect to one or more of the essential elements of the non-movant's cause of action. *Gibbs v. General Motors Corp.*, 450 S.W.2d 827, 828 (Tex.1970). In determining whether a movant has met its summary judgment burden, a trial court must assume the truth of all evidence favorable to the non-movant and indulge every reasonable inference on behalf of the non-movant. *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–549 (Tex.1985).

INGALLS, at trial level, advanced two bases in support of its motion for summary judgment. First, INGALLS contended that the evidence, established as a matter of law, that INGALLS did not design or manufacture the ladder from which Mr. Arceneaux fell. Second, INGALLS contended that even had INGALLS designed the ladder, that plaintiffs' (appellants') claims are barred by the Government Contractor Defense.

■■■ INGALLS first ground for summary judgment was that it did not design or manufacture the ladder from which Mr. Arceneaux fell. With regard to its first summary judgment basis, INGALLS asserts three reasons why it should be sheltered from any liability to Mr. Arceneaux. First, INGALLS contends that it is undisputed that INGALLS did not manufacture the accident ladder. Second, INGALLS contends that it cannot be held liable as the "designer" of the accident ladder on the basis that the manufacturer of the accident ladder "copied" the design of the other ladders on the ship. Finally, INGALLS contends that it was not in fact the designer of those other ladders.

The ladder from which Mr. John Arceneaux fell was not a part of the original vessel. This ladder was added at Todd Shipyard when the S/S JOSEPH LYKES was enlarged in the early 1970's. INGALLS played no role in the enlargement process. However, appellant seeks to hold INGALLS liable as a designer of the accident ladder.

Appellant seeks to hold INGALLS responsible by suggesting that a fact issue exists as to who designed the ladder from which John Arceneaux fell. Appellant positions that since an offset ladder was not called for in the original vessel specifications, the concept of an offset ladder was "apparently" developed by some combination of LYKES, INGALLS and/or Gibbs & Cox. For argument sake, let us accept that the final design of the offset ladder in the original construction of the S/S JOSEPH LYKES was done by INGALLS. Now, applying the actual fact that Todd Shipyard, in "jumboizing" the vessel in the early 1970's, determined to copy INGALLS' design, should INGALLS be liable through a decision by those who subsequently choose to mimic or copy the offset ladder design? As we view appellants' position, this Court is being prompted to create some new concept of strict tort liability against the designer of a product which becomes, in law, a running implied warranty, to and through, anyone who chooses to copy, mimic or plagiarize the original. Thus, we have strict liability through legal osmosis. We cannot abide the taking of such liberties with established legal principles.

■■■ A defendant who designs a product as a conscious part of the overall development of that product may be subjected to strict product liability or liability for negligence, even though the designer never actually manufactures the product or holds title to it. *See Alm v. Aluminum Co. of America,* 717 S.W.2d 588, 590–91 (Tex.1986), *judgment modified on other grounds,* 785 S.W.2d 137 (Tex.), *cert. denied,* 498 U.S. 847, 111 S.Ct. 135, 112 L.Ed.2d 102 (1990) (non-manufacturer designer may be held liable, at least in

negligence).[2] To go further would amount to an obvious distortion of the concepts of fault and unfair extension of allocating economic risk to a defendant, such as INGALLS, which played no active nor conscious role in the development of the accident-causing product, where such product has been copied or used without knowledge or participation on the part of INGALLS.

■■■ A very basic concept of products liability is that the economic consequences of product defects should be placed upon those best able to avoid such defects. *See* Restatement (Second) of Torts § 402A cmt. c (1965). Where the design of a product has been copied without consent, knowledge, or participation by the original designer, liability is best imposed upon the copier of the design rather than the entity whose design has been copied. In our case, Todd Shipyard, being aware of the prevalent circumstances in 1971, chose from among alternatives a ladder design for cargo hold No. 3. There is no summary judgment evidence that INGALLS knew or participated in any way in Todd Shipyard's determination to provide offset ladders in cargo hold No. 3. It is the copying entity who is best able to take into account advances made in the "state of the art" since inception of an original design. When ask about Todd Shipyard's decision to employ the original offset ladder design, naval architecture expert David Brice Waller testified:

> Certainly, whatever was appropriate in design at the time [of the jumboizing operation], they [Todd Shipyard] would have

utilized in their determination of what type of ladders to install.

Under the evidence in the record before us, to impose liability upon INGALLS would be likened to imposing liability upon the estates of the Wright Brothers for a present day crash of a Boeing 767. We believe it fundamentally unfair and legally illogical to hold the original product designer liable for injuries caused through subsequent copying, and especially so in the present case where no evidence points to INGALLS as the "designer" of the specific ladder in question.

In reviewing the summary judgment record, we believe it only fair to give credence to appellants' own contentions. In Plaintiffs' Response in Opposition to Defendants LYKES BROS. STEAMSHIP CO., INC.'s and LITTON SYSTEMS, INC.'s Motion for Summary Judgment, appellants made the following assertions:

> In the middle of the design process on the S/S JOSEPH LYKES, Defendant LYKES BROS. STEAMSHIP CO., INC. decided it wanted an offset ladder instead of a pivoting ladder. At an engineering meeting, this change was discussed. The employees of INGALLS SHIPBUILDING CORPORATION who were present at the meeting warned LYKES BROS. STEAMSHIP CO., INC.'s employees that an offset ladder was dangerous and should not be used. Despite this warning, LYKES BROS. STEAMSHIP CO., INC. opted for an offset ladder on their vessel.

> \*    \*    \*    \*    \*    \*

> Despite the warnings from INGALLS SHIPBUILDING CORPORATION's em-

---

**2.** With respect to liability for breach of implied warranties, the fact that the product designer was not a seller of the product *is* dispositive. Implied warranties are given only by the actual sellers of products, not by others who have played some other role in the distribution of the product. *E.g., Oscar Mayer Corp. v. Mincing Trading Corp.*, 744 F.Supp. 79, 83 (D.N.J.1990) (broker); *Charles E. Beard, Inc. v. Cameronics Technology Corp.*, 729 F.Supp. 528, 530 (E.D.Tex.1989) (marketing consultant), *aff'd on other grounds*, 939 F.2d 280 (5th Cir.1991); *Harmon v. National Automotive Parts Association*, 720 F.Supp. 79, 82 (N.D.Miss.1989) (endorser); *Klo–Zik Co. v. General Motors Corp.*, 677 F.Supp. 499, 507–08 (E.D.Tex.1987) (servicer); *Hemphill v. Sayers*, 552 F.Supp. 685, 689 (S.D.Ill.1982)

(college athletic officials furnishing helmet); *Design Engineering, Construction International, Inc. v. Cessna Finance Corp.*, 164 Ga.App. 159, 296 S.E.2d 195, 198 (1982) (assignee of conditional sales contract and note); *Service Iron Foundry, Inc. v. M.A. Bell Co.*, 2 Kan.App.2d 662, 588 P.2d 463, 472 (1978) (agent for disclosed principal); *Gentile v. MacGregor Manufacturing Co.*, 201 N.J.Super. 612, 493 A.2d 647, 648–50 (1985) (reconditioner of football helmet). *See* Tex.Bus. & Com.Code Ann. § 2.314(a) (Vernon 1994) (warranty of merchantability of goods "is implied in a contract for their sale"); Tex.Bus. & Com.Code Ann. § 2.315 (Vernon 1994) (warranty of fitness for particular purpose is given "[w]here the seller" has knowledge of purpose and buyer's reliance).

ployees, LYKES BROS. STEAMSHIP CO., INC. insisted on the use of an offset ladder.

\* \* \* \* \* \*

Indeed, LYKES BROS. STEAMSHIP CO., INC. had been warned of the danger created by this ladder when it insisted on its installation. LYKES BROS. STEAMSHIP CO., INC. made a knowing decision to install this ladder on its vessel. It should bear the consequences of its choice.

In reviewing the record, the affidavits, deposition testimony, and exhibits, appellants' allegations regarding the identity of the party which chose the offset ladder design confirms that it was Gibbs & Cox which first produced a sketch of the offset ladders. According to the record it was LYKES who identified the offset ladders as the "best solution" and requested their installation. Nowhere does the record bear out that INGALLS was responsible for the decision to use offset ladders even in the original design, let alone during the "jumboization" process in 1971. To rebut this evidence, appellants offered certain testimony of Malcolm Dick, President of Gibbs & Cox. An examination of said evidence, however, makes it clear that Mr. Dick was familiar only with the fact that INGALLS prepared the "detail design" of the ship prior to its construction in 1959. There was no testimony by Mr. Dick to indicate that he was familiar with who was responsible for the design or manufacture of the "accident ladder." Indeed, testimony from Mr. Dick revealed the following:

Q. Do you have any knowledge of what types of ladders were in the JOSEPH LYKES in 1985?

A. No.

Q. Do you have any knowledge of who designed the ladders that were present in cargo hold # 3 on the S.S. JOSEPH LYKES in 1985?

A. The answer is no, and this gentleman is correct, I already told you that I didn't know what ladders there were and therefore, I couldn't possibly know who designed them.

Applying the standard of review previously stated, this Court is of the opinion that INGALLS did establish, as a matter of law, that there exists no genuine issue of material fact with respect to one or more of the essential elements of the Arceneauxs' cause of action. Assuming the truth of all evidence in a light most favorable to appellant, indulging every reasonable inference on behalf of appellant, and resolving all doubt in appellants' favor, we are compelled to conclude that the trial court properly granted summary judgment in favor of appellee INGALLS. Having affirmed the trial court's judgment on this basis, we forego an address to INGALLS' government contractor defense.

## SUMMARY JUDGMENT FAVORING LYKES

We apply the same appellate standard of review in examining a granting of summary judgment as previously discussed. With regard to the summary judgment favoring LYKES, our standard of review is filtered through the appropriate law concerning a vessel owner's duty to longshoremen. For our purposes, the applicable case law begins and ends with the recent case, *Howlett v. Birkdale Shipping Co.*, 512 U.S. ——, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994).

Appellants' claim against LYKES is statutory, grounded in 33 U.S.C.A. § 905(b) (1986). This statute, enacted in 1972, authorizes a person covered by the Longshore & Harbor Worker's Compensation Act to bring a cause of action against a vessel owner in the event of an injury that was "caused by the negligence of a vessel." 33 U.S.C.A. § 905(b) (1986). Section 905(b) provides:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons en-

gaged in providing stevedoring services to the vessel. If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

Because Congress did not specify the acts or omissions of the shipowner that would constitute negligence, the contours of a shipowner's duty to longshore workers are left to be resolved through the application of accepted principles of tort law and the ordinary process of litigation. *Howlett,* 512 U.S. at ——, 114 S.Ct. at 2063, 129 L.Ed.2d at 87. Applying tort law principles in the context of stevedoring operations, the Supreme Court explained that shipowners owe three distinct duties of care to longshore workers, *viz:*

> The first, which courts have come to call the "turnover duty," relates to the condition of the ship upon the commencement of stevedoring operations. [citation omitted]. The second duty, applicable once stevedoring operations have begun, provides that a shipowner must exercise reasonable care to prevent injuries to longshoremen in areas that remain under the "active control of the vessel." [citation omitted]. The third duty, called the "duty to intervene," concerns the vessel's obligations with regard to cargo operations in areas under the principal control of the independent stevedore. [citation omitted].

*Howlett,* 512 U.S. at ——, 114 S.Ct. at 2063, 129 L.Ed.2d at 87.

Although relying heavily on its discussion in *Scindia Steam Navigation Co. v. De los Santos* [3], the Court in *Howlett* was presented facts raising the issue of "turnover duty," as opposed to the *Scindia* case which involved the "duty to intervene." As we appreciate the facts of the instant case, we are presented with facts raising the issue of "turnover duty."

■ As discussed in *Howlett,* "turnover duty" places on the shipowner the duty to warn longshore workers of latent hazards that are known to the shipowner or should be known to it in the exercise of reasonable care. *Howlett,* 512 U.S. at ——, 114 S.Ct. at 2066–67, 129 L.Ed.2d at 91–92. "Latent hazards" are defined in this context as hazards that are not known to the stevedore and that would be neither obvious to nor anticipated by a skilled stevedore in the competent performance of its work. *Id.* at ——, 114 S.Ct. at 2067, 129 L.Ed.2d at 91.

■ LYKES advanced basically two grounds for summary judgment: 1) LYKES owed no duty and, 2) appellants' negligent design claim is, in essence, a prohibited claim of unseaworthiness. With regard to the second ground, we find that *Howlett* effectively overrules this proposition as well as the list of intermediate federal appellate court authority cited by LYKES. The Court in *Howlett* clearly intended to impose a duty, albeit "a narrow one," upon shipowners towards longshore workers "relat[ing] to the condition of the ship upon the commencement of stevedoring operations." *Id.* at ——, 114 S.Ct. at 2063, 129 L.Ed.2d at 87. It therefore follows that *Howlett* recognized the existence of at least a qualified duty from shipowners to longshore workers. We now turn, in the instant case, to the pertinent summary judgment evidence in order to determine whether or not said qualified duty was proven.

■ Recall that a shipowner's "turnover duty" is to warn of "latent hazards" in the cargo area that are known or should be known to the shipowner in the exercise of reasonable care, and to warn only of those "latent hazards" that are not known to the stevedore and that would be neither obvious

**3.** 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

nor anticipated by a skilled stevedore competently performing his job. *Id.* at ——, 114 S.Ct. at 2066–67, 129 L.Ed.2d at 91–92. This translates, for summary judgment review, to examining the summary judgment evidence, with all of the assumptions and inferences in the light most favorable to the nonmovant, so as to determine that no genuine issue of a material fact exists with regard to the following: Proposition 1—that the ladder in question was an open and obvious hazard; Proposition 2—that, if not an open and obvious hazard, the ladder was a hazard that was known to the stevedore, or that said hazard was obvious to him, or that could be anticipated by a skilled stevedore competently performing his job; or, Proposition 3—that, even if material fact issues existed with regard to Propositions 1 and 2, the shipowner had no actual knowledge of the hazardous ladder and indeed should not have known of its hazardous nature even in the exercise of reasonable care.

With regard to Propositions 1 and 2, we find that LYKES itself provides the issues of material fact so as to preclude summary judgment in its favor. Contained in its amended motion for summary judgment is the following evidentiary contention by LYKES:

> The stevedore had not found any safety conditions that would preclude initiating the cargo loading operations or required the stoppage of loading. *See* Exhibit "3", (sic) sworn statement of Mark McAndrews (Job Superintendent), Pages 3–4, 6, 15–16.

An examination of Mr. McAndrews' deposition testimony pertinent to this issue reveals the following:

Q. (Counsel for LYKES) When you took control of the holds and the vessel, the JOSEPH LYKES, did you find it to be in a reasonably safe condition for loading?

A. (McAndrews) Yes, sir. Had the gear certificate expired, or something like that, we wouldn't have worked, no, sir. *There were no visible safety hazards.* (emphasis added).

In contrast to the above summary judgment contention put forward by LYKES, LYKES' appellate brief contains the following statement concerning any duty LYKES may have owed to any of the longshore workers present the day of Mr. Arceneaux's fall:

> It is undisputed that the risks presented by the offset feature of the ladder in question were not hidden dangers. Three different longshoremen who were present in the No. 3 hold of the JOSEPH LYKES on the day of this accident all stated that they were aware of the offset in the secondary access ladder, as well as the added difficulties it presented in ascending the ladder. (Tr. 611, 618, 627). Indeed, this condition was "as apparent to the Stevedore and its longshoremen employees as to the ship owner." [citation omitted]. Under the circumstances, LYKES had no duty to warn Mr. Arceneaux of this condition on turning over the ship to the stevedores.

The deposition testimony of the three longshore workers does reflect that they were aware of the "bend" in the ladder and of the difficulty in climbing said ladder. It is apparent to this Court based upon the summary judgment evidence that a material fact issue does exist as to whether or not the alleged hazardous nature of the ladder in question was "open and obvious" to anyone, including the stevedore in charge on the day of the incident.

As to Proposition 3, the knowledge issue, LYKES provides the following observation in its amended motion for summary judgment:

> As to Lykes (sic) actual knowledge of the safety of the two ladders, Mr. Thayer of Lykes believes that the offset ladder does not present an unreasonable risk to longshoremen given a reasonably competent stevedore. *See* Exhibit "7" Page 41. The class of ships of the JOSEPH LYKES have been in existence for close to thirty years. Mr. Thayer estimates that there have been hundreds of thousands of longshoreman (sic) who go up and down the ladders in the basic class of ships in that period of time. Mr. Thayer is not familiar with any accident involving a longshoreman relating to the incline offset feature of the ladder. *See* Exhibit "7" and "7a", (sic) Pages 41–43.

The record reflects that Stewart W. Thayer is vice president of engineering and in charge

of the New Construction Division of LYKES BROS. STEAMSHIP COMPANY. Thayer, at the time of his deposition, had worked for LYKES for forty-one years. The pertinent portion of Thayer's testimony is as follows:

Q. (Counsel for LYKES) Okay. Based upon your professional training, experience, your involvement in these vessels, use of the ladder, do you have an opinion as to whether the incline ladder presents an unreasonable risk to stevedores who are reasonably competent?

A. (Thayer) No, sir, it does not.

Q. And is there anything additionally that you would base that opinion?

A. Having gone up many, many times myself, plus the fact that many of these ships have now been in service—'60, '70, '80—some of them over 25 years.

\*      \*      \*      \*      \*      \*

In that time, there must have been hundreds of thousands of longshoremen go up and down those ladders. And I have never heard of an accident involving a longshoreman relating to the fact that the ladder had an incline and it—or not an incline, an offset in this.

Consistent with Thayer's testimony, LYKES' amended motion for summary judgment contends the following with regard to its lack of knowledge of any latent hazardous condition at to the offset ladder:

In the only known fall from the ladder, the Court found the design of the ladder to be non-negligent and the fall to be caused by the longshoreman's carelessness.

LYKES provides no proof of this contention. Nevertheless, just three pages earlier in their amended motion, LYKES makes the following contention with regard to owing no duty to the longshore workers:

In the instant case, any danger presented by the ladder was an open and obvious danger, and not a hidden danger. Given that the duty to warn does not extend to open and obvious dangers, as noted above, Lykes has not duty to warn the plaintiff of the danger presented by the ladder. [citation omitted].

LYKES argues in one breath that the hazardous nature of the ladder in question was blatantly open and obvious, over several decades, to longshore workers and stevedores alike; then next argues that knowledge could not be imputed to it (LYKES) because over the several decades that the ship was in service involving "hundreds of thousands" of longshore workers going "up and down those ladders," no falls occurred for which LYKES was legally responsible.

For summary judgment review purposes and under the dictates of *Howlett* we find the record before us does indeed raise genuine issues of material fact with regard to the alleged hazardous nature of the ladder in question, and to whether or not LYKES knew or should have known of any latent hazardous nature of the ladder if said nature is proven. We therefore sustain appellants' point of error one and remand the cause to the trial court for trial on the merits only as to defendant LYKES BROS. STEAMSHIP COMPANY.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.