Jay BLACKMON and Kendel Blackmon, Individually and as Next Friends of Todd Christopher Blackmon et al., Plaintiffs,

v.

AMERICAN HOME PRODUCTS CORPORATION et al., Defendants.

No. CIV.A. G–02–179.

United States District Court, S.D. Texas, Galveston Division.

Oct. 1, 2004.

Susan E. Burnett, Clark Thomas & Winters, Austin, TX, Lauren S. Elliot, Richard W. Mark,Daniel J. Thomasch, Orrick Herrington, New York City, for American Home Products.

John R. Gilbert, Gilbert & Moore, PLLC, Angleton, TX, for Dow Chemical Co.

Andrew S. Hanen, Brownsville, TX, Michael R. Klatt, Clark Thomas and Winters, Austin, TX, Stephen Robert Lewis, Jr.,

Lewis & Williams, Galveston, TX, for Wyeth.

Richard L. Josephson, Baker & Botts, Houston, TX, for Merck & Co., Inc.

Raymond G. Kolts, Dean & Kolts, Coeur d'Alene, ID, David Michael MacDonald, McCauley MacDonald & Devin, Dallas, TX, for Sigma Aldrich Inc.

Jeffery A. Kruse, Deborah A. Moeller, Andrew See, Shook Hardy, Kansas City, MO, Erik V. Larson, Preis Kraft and Roy, Houston, TX, Diana L. Panian, Gardere Wynne, Houston, TX, Sandra Lynn Phillips, Baker Hostetler, LLP, Houston, TX, Douglas W. Poole, McLeod Alexander, Galveston, TX, for Eli Lilly Co.

Barclay A. Manley, Fulbright & Jaworski, Houston, TX, for Glaxosmithkline.

Tanja Karin Martini, Hermes Sargeant, Dallas, TX, Peter Anderson Moir, Quilling Selander, Dallas, TX, C. Andrew Waters, Walter & Kraus, Dallas, TX, for Brandon Hilton Kuehn.

John Wesley Raley, III, John A. Scully, Cooper & Scully, Houston, TX, for Spectrum Chemical Manufacturing.

Rebecca Jo Reser, Davidson & Trolilo, San Antonio, TX, Russell O. Stewart, Jeanne E. Walker, Faegre & Benson, LLP, Denver, CO, for Aventis Pasteur, Inc.

John Martin Ribarits, Preis Kraft, Houston, TX, for GDL International, Inc.

Marc A. Sheiness, Sheiness Scott, Houston, TX, for EM Industries, Inc.

Martin Jonathan Siegel, Watts Law Firm, LLP, Houston, TX, for Alan R. Strauss.

## ORDER GRANTING DEFENDANT ELI LILLY'S MOTION FOR SUMMARY JUDGMENT

KENT, District Judge.

This lawsuit arises out of injuries sustained by Todd Blackmon, Brandon Kuehn, and Colby Scott ("Minor Plaintiffs") allegedly resulting from mercury contained in childhood vaccines. Minor Plaintiffs and their parents (collectively, "Plaintiffs") allege that Defendant Eli Lilly ("Lilly"), the original designer of a mercury-containing vaccine preservative called thimerosal, concealed facts indicating the toxicity of thimerosal and failed to test its product properly. Now before this Court is Lilly's Motion for Summary Judgment.

### I. Background

Lilly's involvement with thimerosal goes back some 80 years. In the 1920s, Dr. Morris S. Kharasch of the University of Maryland, allegedly a recipient of a Lilly fellowship, developed thimerosal. Together with Lilly, Kharasch patented several versions of the chemical. In 1929, Lilly registered the trade name "Merthiolate" for use in marketing thimerosal as a topical antiseptic. Over the next several decades, Lilly sold a variety of thimerosal-containing products such as antiseptics, germicides, and ophthalmic ointments. Kharasch and Lilly obtained the last thimerosal-related patent in 1955, and all patents expired by February, 1972.

Plaintiffs allege that Lilly concealed various dangers of thimerosal. In particular, Plaintiffs allege that Lilly knew of problems with a study of thimerosal done by Dr. K.C. Smithburn from 1929–1930. Dr. Smithburn injected a 1% solution of thimerosal into 22 subjects suffering from meningitis. He also used it topically, applying it to each nostril after a dose of ephedrine sulphate. Plaintiffs claim that Lilly covered up the fact that Smithburn's subjects suffered from meningitis. Plaintiffs also claim that Lilly covered up Smithburn's conclusion that the topical application of thimerosal was "symptomatic." (Pls' Am. Compl. at 11.) Plaintiffs do not describe

what symptoms these subjects had. According to the Food and Drug Administration ("FDA"), a few of Smithburn's subjects suffered sloughing of the skin at the injection sites. (*Thimerosal in Vaccines*, FDA Report, Mot. of Defs' Wyeth, Aventis Pasteur Inc., and Merck Co., Inc., for Summ. J., Ex. 4 at 5 ("Defendants' Ex. 4").) Lilly frequently pointed to the Smithburn study as evidence of the safety of thimerosal.

A 1930 interoffice memo stated that thimerosal might be dangerous and should not be sold in concentrations greater than that already tested, one part per 4000. (Pls' Am. Compl. at 12.) Plaintiffs do not indicate the nature of the danger or what form of thimerosal presented this danger. Plaintiffs also allege that Lilly scientists recommended that thimerosal be used in vaccines in a concentration of one part per 10,000. (*Id.* at 13.) A 1958 patent application specifically referred to a thimerosal solution as an effective preservative and anti-contaminant for the poliomyelitis vaccine. This patent stated that the "preferred form of the vaccine" included thimerosal "in the concentration of 0.000247 molar." U.S. Patent No. 2,864,844 (issued Dec. 16, 1958).

Over the next several decades, Lilly allegedly received articles describing problems with thimerosal. Some indicated that it should not be injected into or used as an ophthalmic ointment on those patients sensitive to a topical application of the drug. One stated that it should not be used intravenously more than every ten days, and another said that it could cause "a disabling dermatologic condition." (*Id.* at 15.) A 1950 article from the New York Academy of Sciences said that thimerosal could not be used in chemotherapy because it was toxic when used parenterally (entering the body other than by way of the intestines). (*Id.* at 16.)

Plaintiffs also allege that Lilly received an article in 1972 (around the time at which its last patent expired) which said that six people died from mercury poisoning after receiving thimerosal. Plaintiffs do not name the article or give any description of the circumstances of the deaths. (Pls' Am. Compl. at 18.) The phrasing used by Plaintiffs to describe the article would have the reader believe that these deaths occurred in connection with vaccinations. According to the Institute of Medicine ("IOM"), however, these deaths resulted from abnormally high doses of thimerosal, and they were not associated with regular vaccinations. (Institute of Medicine, *Immuunization Safety Review: Thimerosal–Containing Vaccines and Neurodevelopmental Disorders*, Pls' Resp. to (1) Mot. for Partial Summ. J. as to Design Defect and Warnings Claims and Mot. to Dismiss, or Alternatively to Strike Allegations Pursuant to Rules 9(b), 12(b)(6), and 12(f) as to Marketing Defect, Fraud and Conspiracy, and Punitive Damages Claims, and (2) Mot. of Defs. Wyeth, Aventis Pasteur Inc., and Merck & Co., Inc. for Summ. J. Pursuant to Fed. R.Civ.P. 56(b) ("Plaintiffs' Response"), Ex. 1 at 42.)

Lilly did not manufacture, distribute, or license the thimerosal contained in the vaccines received by these children, nor did it design, manufacture, distribute, license, or sell the vaccines themselves. In their Amended Complaint, Plaintiffs make claims of strict liability for product defects, negligence, gross negligence, and fraud and conspiracy against all Defendants. Plaintiffs allege that Lilly failed to perform adequate tests on thimerosal, that Lilly concealed known dangers, and that Lilly conspired with the other Defendants to defraud Plaintiffs. Plaintiffs allege that Minor Plaintiffs suffer from the effects of mercury poisoning due to thimerosal con-

tained in vaccines received between 1996 and 1999. Petitions filed in the Vaccine Court specified autism as the Minor Plaintiffs' injury. Plaintiffs have not presented the Court with any summary judgment evidence linking mercury to autism.

## II. Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When one party moves for summary judgment, the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512. "[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 257, 106 S.Ct. at 2514. Once the moving party has shown that there are no issues of material fact, the nonmoving party must "go beyond the pleadings" to show that a genuine issue exists. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). "We do not, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Id.* The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *See Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510. Therefore, the Court must decide whether Plaintiffs have brought forth sufficient *evidence*-not allegations in the pleadings-to support a jury finding in their favor.

Nevertheless, if the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

## III. Strict Liability

While Plaintiffs state in their Opposition to Lilly's Motion for Summary Judgment that their claim against Lilly sounds in negligence, not strict liability, their Amended Complaint includes a strict liability claim against all Defendants. Plaintiffs claim that the thimerosal-containing vaccines were defective products and that Defendants knew of and failed to warn of the dangers of the vaccines. Although Plaintiffs have apparently abandoned their strict liability claims against Lilly, they do rely on a recent case from the Eastern District of Louisiana, *Easter v. Aventis Pasteur, Inc.,* Civil Action No. 5:03–CV–141–TJW (E.D.Tex. Feb. 11, 2004), in support of their negligence claims.

They cite this strict liability case for the proposition that Texas law allows a design defect claim in these circumstances. *Easter* also involved a child who suffered neurologic injury allegedly because of thimerosal-containing vaccines. *Id.* The court denied Lilly's 12(b)(6) motion to dismiss the design defect claim. *Id.* at 21. However, a 12(b)(6) motion simply tests whether the plaintiff has properly pleaded his cause of action. Fed.R.Civ.P. 12(b)(6) ("failure to state a claim upon which relief can be granted"). In contrast, a motion for summary judgment examines whether there is any "genuine issue as to any mate-

rial fact" and whether "the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56. The court may consider "pleadings, depositions, answers to interrogatories, admissions on file," and affidavits in making this determination. *Id.* Therefore, the fact that a similarly-situated plaintiff survived a 12(b)(6) motion to dismiss is not conclusive as to a motion for summary judgment. A motion for summary judgment requires evidence beyond mere allegations in the pleadings. None of the scant evidence offered by plaintiffs supports a claim based on strict liability.

Because *Easter* neither controls nor provides significant guidance in the instant case and because Plaintiffs appear to have abandoned their strict liability claims against Lilly, Lilly's Motion for Summary Judgment is **GRANTED** as to Plaintiff's strict liability claims.

## IV. Negligence

■ Plaintiffs allege that Defendants "negligently and carelessly researched, manufactured, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, distributed, bought, offered for sale, supplied, sold, marketed, re-branded, manufactured for others, packaged, and advertised certain vaccines containing thimerosal (mercury)." (Pls' Am. Compl. at 25.) In order to be held liable for negligence, a party must owe a duty of care, the party must breach that duty, and injury must proximately result from that breach. *See, e.g., Firestone Steel Prod. Co. v. Barajas,* 927 S.W.2d 608, 613 (Tex.1996); *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990).

### A. Duty

■ In Texas, "a duty of care arises when conditions are such 'that a prudent person would have anticipated and guarded against the occurrence which caused' another's injury." *Alm v. Aluminum Co. of America,* 717 S.W.2d 588, 590 (Tex.1986) (quoting *St. Louis Southwestern Ry. Co. of Texas v. Pope,* 98 Tex. 535, 86 S.W. 5, 7 (1905)). "[T]he existence of duty is a question of law for the court to decide from the facts surrounding the occurrence in question." *Greater Houston,* 801 S.W.2d at 525. Plaintiffs argue that according to section 321 of the *Restatement (Second) of Torts,* Lilly had a duty "to prevent risk once prior conduct is found to be dangerous." However, Texas has specifically rejected this duty. *See American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 438 (Tex. 1997). In general, Texas courts consider "the risk, foreseeability, and the likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Id.* Texas courts have already considered these factors in two cases involving a designer of a product who is not also the manufacturer.

*Alm v. Aluminum Co. of America* dealt with a claim of negligent design against Alcoa, the designer of a capping machine for soft drink bottles. 717 S.W.2d at 589. The cap exploded off the plaintiff's soft drink bottle and injured him. *Id.* at 590. The court held that the designer could be held liable just like a company that both designed and manufactured a product. *Id.* at 591. However, Alcoa also manufactured and sold the capping machine, licensed the manufacture of its patented caps, and marketed the whole capping process. *Id.* at 589–590. The court viewed Alcoa as the first step in the direct line between the injured user of the product and the product's originator. *Id.* at 591. It found that "Alcoa had a duty to warn of the hazards associated with its closure technology if a reasonably prudent person in the same position would have warned of the haz-

ards." *Id.* In this case, Alcoa knew to whom it had sold the capping machines and to whom it had licensed manufacture of the caps it designed.

In *Arceneaux v. Lykes Bros. Steamship Co.*, 890 S.W.2d 191 (Tex.App.-Beaumont 1994, writ denied), a longshoreman fell off a ladder in a vessel owned by the defendant and sustained injuries. The plaintiff claimed that the design of the ladder caused his injury. *Id.* at 195. He sued Ingalls Shipbuilding Corporation ("Ingalls"), the original builder of the ship. *Id.* at 193. However, another company who copied the ladder design from Ingalls actually built the ladder in question. *Id.* at 194. Plaintiff alleged that although Ingalls did not build the actual ladder, it did design it. *Id.* Ingalls did not know that the other company had copied its design. *Id.* The court refused to hold Ingalls liable, saying that the original designer should not have to warranty the products of "anyone who chooses to copy, mimic, or plagiarize the original." *Id.* at 195. The court distinguished this case from *Alm* because Ingalls "played no active nor conscious role in the development of the accident-causing product" and the product was "copied or used without knowledge or participation on the part of INGALLS." *Id.* at 195–196. Finally, the court explained the public policy rationale for this decision: "It is the copying entity who is best able to take into account advances made in the 'state of the art' since inception of an original design." *Id.* at 196.

The instant case lies between *Alm* and *Arceneaux.* In *Alm*, Alcoa both knew that its bottle cap design was being manu-

factured by another company and profited from that manufacture through a licensing agreement. *Alm*, 717 S.W.2d at 589. In *Arceneaux*, Ingalls did not know of the copying of its ladder design. *Arceneaux*, 890 S.W.2d at 196. Here, Lilly knew that other companies were manufacturing thimerosal, but it did not license or in any way participate in that production.[1] Without licensing or participating in the manufacture and marketing of the thimerosal, Lilly had no place in the chain leading from the origination of the product to its use by the consumer. In *Alm*, Alcoa and the bottle cap manufacturer had merely split the functions of design and manufacture between the two companies. Alcoa's design was the first step toward Alcoa's goal of production of the actual bottle cap that injured the plaintiff. Allowing such a designer to escape liability for a defective or negligent design would allow it to enjoy all the profits and none of the risk. In *Arceneaux* and in the instant case, though, the designer enjoyed no profit from the actual injury-causing product. Extending liability to those designers would cause them to incur all the risk and none of the profit. As the court in *Arceneaux* stated, a designer should not be liable when another company copies the designer's original design, since "[i]t is the copying entity who is best able to take into account advances made in the 'state of the art' since inception of an original design." *Arceneaux*, 890 S.W.2d at 195–196.

Texas courts also considered a third related case, *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608 (Tex.1996), which also dealt with a claim against a non-manufacturing designer. The plaintiffs

1. In their Amended Complaint, Plaintiffs allege that Lilly did license thimerosal. (Pls' Am. Compl. at 28.) However, Lilly asserts in its Motion for Summary Judgment that it is undisputed that Lilly did not license thimerosal. Plaintiffs do not contest this in their Opposition to Lilly's Motion for Summary Judgment. Also, they offer no evidence that Lilly licensed this product; in particular, they offer no evidence that Lilly licensed the manufacture of the particular product received by Minor Plaintiffs.

claimed that Firestone designed the tire which caused the injury, but the court found as a matter of law that Firestone was *not* the designer because of the actual manufacturer made significant changes to Firestone's original design. Lilly argues that *Barajas* controls this case. Neither Plaintiffs nor Lilly have offered evidence on the question of whether there were significant changes made to the thimerosal received by Minor Plaintiffs. Therefore, the Court will assume for the purposes of summary judgment that Lilly did originally design thimerosal.

■ Most of Plaintiffs' allegations that Lilly knew of the dangers of thimerosal rely on references to published articles.[2] It would be a heavy burden indeed to expect the original designer of a chemical to give notice to all other manufacturers of any articles published in publicly-available journals that might indicate problems with that chemical. In this case, Lilly did not even license the production of thimerosal by these other companies, so while Lilly might have known that other companies were copying its design, it could not be expected to keep track of all unlicenced manufacture of the chemical.

■ Even if Lilly had designed thimerosal on behalf of other manufacturers and sold or licensed the design to them, Plaintiffs have not satisfied their burden of production in bringing forth evidence that Lilly knew that low concentrations of thimerosal might cause neurological damage (or for that matter, any sign of mercury poisoning) when used in vaccines. Manufacturers and sellers of a product have a duty to warn users of the dangers of products of which they have actual or constructive knowledge. *Muncy v. Magnolia Chem. Co.*, 437 S.W.2d 15, 17 (Tex.Civ. App.-Amarillo 1968, writ ref'd n.r.e.). Assuming all Plaintiff's unsubstantiated allegations to be true, Plaintiffs have not shown that at the time Minor Plaintiffs received thimerosal-containing vaccines, Lilly knew that thimerosal used in this way could cause even the general type of injury suffered by Minor Plaintiffs, nor have they shown that Lilly knew or should have known to test thimerosal for the possibility that it would cause autism. Lilly has no duty to warn of dangers of which it did not and should not have known.

Therefore, this Court finds as a matter of law that Lilly, who did not manufacture or license the manufacture of the thimerosal that allegedly caused Minor Plaintiffs' autism, had no duty to Plaintiffs.

### B. Breach of Duty

Even if Lilly did have a duty to Plaintiffs, Plaintiffs have not provided any summary judgment evidence showing any breach of duty. Plaintiffs allege that Lilly breached its duty to warn of the dangers of thimerosal and also to test the chemical properly.

■ In Texas, the plaintiff in a failure to warn case "must show both that the warning was defective and that it was the producing cause of the plaintiff's injury." *Wyeth–Ayerst Laboratories Co. v. Medrano*, 28 S.W.3d 87, 94 (Tex.App.-Texarkana 2000, no writ). In this case, it is an undisputed fact that no warning regarding mercury poisoning or potential neurological damage was given. However, a defendant cannot breach a duty to warn if there is no

---

**2.** The two exceptions are the fact that Dr. Smithburn's subjects were not healthy but had meningitis and the interoffice memo stating that merthiolate might be dangerous in concentrations higher than one part per 4,000, neither of which bear on the possibility of mercury poisoning when thimerosal is used as a vaccine preservative in concentrations equal to or less than one part per 10,000.

danger. Therefore, to show that Lilly breached a duty to warn, Plaintiffs must show that this danger of developing autism due to thimerosal-containing vaccines exists. Plaintiffs' own evidence states that no scientific evidence exists connecting thimerosal to autism. (Plaintiffs' Response, Ex. 1 at 5.) This matter is considered in more detail in the discussion below on causation.

■ Plaintiffs also claim that Lilly breached its duty to test its chemical properly. First, Plaintiffs have neither alleged nor brought forth evidence describing the standard of care for pharmaceutical research. Plaintiffs rely heavily on Lilly's conduct in promoting the results of the study conducted by Dr. Smithburn in the 1930s as evidence that Lilly acted negligently in testing its product. They allege that Lilly failed to notify the scientific community that Dr. Smithburn's subjects all had meningitis, instead allowing others to believe that he had injected thimerosal into healthy subjects. Plaintiffs fail to explain how this omission could have made thimerosal appear safer. Plaintiffs also fail to take into account the vastly different standards for medical experimentation that existed in the 1930s. While we may today view it as an unethical or improper scientific technique to conduct such studies on subjects who are ill, there is no evidence that this study did not comport with the standards of the day.

Plaintiffs also allege that Lilly should have engaged in further testing of thimerosal when it received the various articles indicating potential problems. However, Plaintiffs only provide short descriptions or excerpts from these articles in their Amended Complaint. From this scanty evidence, a reasonable jury could not possibly find that Lilly breached its duty to test thimerosal thoroughly. For example, Plaintiffs refer to documents and studies showing that topical applications of thimerosal caused skin irritation in some users. Plaintiffs do not indicate how such findings would cause a reasonable party to believe that thimerosal needed to be tested for its potential to cause autism. Plaintiffs also point to a 1950 article, allegedly sent to Lilly, stating that thimerosal was "toxic" when administered parenterally. Plaintiffs offer, in their Amended Complaint, a one-sentence excerpt from this article. (Pls' Am. Compl. at 16.) Since Plaintiffs do not describe what kind of "toxic" reactions were observed, this allegation does not support a finding that Lilly should have known to test for autism.

Similarly, Plaintiffs describe a 1972 article, also allegedly sent to Lilly, that analyzed six deaths from injections of thimerosal. In the copy of the IOM report on mercury in vaccines provided by Plaintiffs, the IOM describes this article in somewhat more detail than do Plaintiffs in their Amended Complaint. The IOM report indicates that these deaths did not occur as a result of normal vaccinations. Instead, they occurred in unusual circumstances involving high doses of thimerosal. (Plaintiffs' Response, Ex. 1 at 42.) Many chemicals and drugs are deadly when taken in high doses. This fails to establish, or even raise a question of fact, as to whether Lilly should have conducted further testing on the use of low doses of thimerosal in vaccines.

Also, this 1972 article came out in the same year in which Lilly's last thimerosal-related patent expired. At that point, Lilly was in no better position than other manufacturers to evaluate the risks of the chemical, especially when notice of those risks came from published articles.

Plaintiffs also fail to account for the fact that the toxicity of methylmercury, an organic mercurial similar to the ethylmercury found in thimerosal, was not recognized

until the 1950s. Even then, it was thought to be toxic in high doses but safe in lower ones. (Defendants' Ex. 4 at 4.) Neurological damage was only observed in infants who had *prenatal* exposure to methylmercury. *Id.* The U.S. Environmental Protection Agency and other agencies then developed exposure guidelines for methylmercury. *Id.* Methylmercury is thought to be slightly more toxic than ethylmercury, and no guidelines have been set for ethylmercury. (Centers for Disease Control, *Thimerosal & Vaccines*, Mot. of Defs. Wyeth, Aventis Pasteur Inc., and Merck Co., Inc., for Summ. J., Ex. 6 at 4 ("Defendants' Ex. 6").) Until the 1990s, when the number of recommended childhood vaccines increased, children would not have received amounts of ethylmercury in excess of the amounts given in the EPA's conservative exposure guidelines for methylmercury.[3] Given that the dangers of organic mercurials were unknown when Lilly developed thimerosal and that any risk associated with vaccination did not develop until the 1990s, Plaintiffs' allegations that Lilly should have tested for this sort of injury fall short.

Because Plaintiffs have failed to provide summary judgment evidence from which a reasonable jury could conclude that Lilly breached a duty to Plaintiffs, this Court finds that Lilly did not breach any duty to Plaintiffs.

### C. Causation

■ Plaintiffs must produce evidence that thimerosal proximately caused Minor Plaintiffs' injuries. "Proximate cause con-

sists of cause in fact and foreseeability." *El Chico v. Poole*, 732 S.W.2d 306, 313 (Tex.1987).

■ Plaintiffs must first establish that thimerosal actually caused Minor Plaintiffs' injuries. "Establishing causation requires facts sufficient for a jury to reasonably infer that the defendants' acts were a substantial factor in bringing about the injury." *Flock v. Scripto–Tokai Corp.*, 319 F.3d 231, 237 (5th Cir.) (interpreting Texas law). Plaintiffs have not brought forth sufficient evidence to allow a reasonable jury to find for Plaintiffs on the issue of cause in fact. Plaintiffs' only evidence connecting thimerosal to autism is the IOM study, which states that there is insufficient data to reach a conclusion on the hypothesis that thimerosal-containing vaccines cause neurological damage to children. (Plaintiffs' Response, Ex. 1 at 5–6.) Such a conclusion cannot establish causation. *See Flock*, 319 F.3d at 237 ("[W]hen circumstances are consistent with either of two factual scenarios and one is no more probable than the other, neither can be inferred."); *Litton Indus. Prod., Inc. v. Gammage*, 668 S.W.2d 319, 324 (Tex.1984). The IOM study also states that there is *no evidence* connecting thimerosal-containing vaccines to autism. (Plaintiffs' Response, Ex. 1 at 5; Defendants' Ex. 4 at 5–7; *Study Fails to Show a Connection Between Thimerosal and Autism*, American Academy of Pediatrics, Mot. of Defs. Wyeth, Aventis Pasteur Inc., and Merck Co., Inc., For Summ. J., Ex. 5; Defendants' Ex. 6 at 5–7.)[4] Also, Plaintiffs have

---

**3.** Of all the agencies who have promulgated guidelines for exposure to methylmercury, the EPA has issued the lowest, most conservative guidelines. An exposure that exceeds the EPA guidelines may be well within the guidelines put forth by other organizations, such as the World Health Organization. Therefore, it should not be assumed that an exposure

above EPA levels will automatically result in mercury poisoning.

**4.** Plaintiffs offer two statements by the American Academy of Pediatrics expressing concern over thimerosal. However, those statements were issued in 1999 and 2000, while the statement relied on by Defendants was

made no effort to show that Minor Plaintiffs' autism did not result from one of the other known causes of autism, such as genetics or prenatal exposure to certain chemicals. Nor have Plaintiffs shown that such known causes could combine with exposure to thimerosal to cause autism. Therefore, Plaintiffs have not established cause in fact.

■■■■ To prove proximate cause, Plaintiffs must also demonstrate foreseeability of the injury. "Foreseeability does not require [that] the actor anticipate the particular accident, but only that he reasonably anticipate the general character of the injury." *El Chico*, 732 S.W.2d at 313. While Plaintiffs have alluded to some unproduced documentation showing that Lilly knew of some possible harms from thimerosal, Plaintiffs have not even alleged the existence of any specific documentation tending to show that Lilly knew or should have known that the amount of thimerosal contained in vaccines would cause mercury poisoning, neurological damage, or autism in children. Plaintiffs also allege that Lilly should have known in the 1920s and 1930s when it developed thimerosal that the level of thimerosal received by children in the 1990s would cause autism, even though children receive more vaccines-and thus more thimerosal-now than in the 1930s. Any possible link between Lilly's conduct in the 1920s and 1930s and Minor Plaintiffs' injuries is too attenuated to support a finding that Lilly could have foreseen, in the 1930s, that Minor Plaintiffs would suffer neurological damage from thimerosal-containing vaccines. This Court finds that Plaintiffs have not brought forth sufficient summary judgment evidence to allow a reasonable jury to conclude that Lilly's conduct proximately caused Minor Plaintiffs' injuries.

### D. Conclusion

■■■■ When the designer has no intent for the manufacturer to use its design, then the extension of liability to that designer for the manufacturer's product is unreasonable and unsupported by Texas law. It is not the province of this Court to expand Texas tort law beyond the limits articulated by the Texas legislature and the Texas courts.[5] Because Lilly owes no duty to Plaintiffs and because Plaintiffs have failed to provide sufficient evidence from which a trier of fact could reasonably find in Plaintiffs' favor on the issues of causation and breach of duty, this Court GRANTS Lilly's Motion for Summary Judgment as to Plaintiffs' negligence claims.

### V. Gross Negligence

As Plaintiffs have failed to establish ordinary negligence, their claims of gross negligence fail as a matter of law. Even if Plaintiffs' ordinary negligence claims had sufficient evidentiary support to create a dispute over a material fact, Plaintiffs have alleged no facts tending to show the sort of egregious behavior necessary to prove gross negligence. Therefore, Lilly's Motion for Summary Judgment as to Plaintiffs' claims for gross negligence is GRANTED.

### VI. Fraud and Conspiracy

Plaintiffs allege that Defendants misrepresented material facts about thimerosal to the FDA, consumers, and the general public. (Pls' Am. Compl. at 26.) In 1973, the

issued in May of 2003. (Plaintiffs' Response, Exs. 2 and 3.)

**5.** *See Block v. Wyeth, Inc.*, No. 3:02–CV–1077, 2003 WL 203067, at *3 (N.D.Tex. Jan.28, 2003) (refusing to "extend Texas tort law into new and uncharted territory" in order to hold the original designer of a drug liable for alleged defects in a generic version of the drug).

FDA asked Lilly for all the information it had about thimerosal. (*Id.* at 18–19.) Plaintiffs allege that Lilly defrauded the FDA by failing to provide the FDA with information such as the 1972 article about mercury poisoning from large doses of thimerosal, instead relying on the early articles by Powell and Jamieson.

 The elements of a fraud claim are: (1) a material misrepresentation that was false; (2) knowledge of that falsity or reckless disregard for the truth; (3) intention to induce reliance on the representation; and (4) actual and justifiable reliance on the misrepresentation resulting in injury. *See Ernst & Young v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001). It is not necessary that Plaintiffs prove that Lilly intended for Plaintiffs in particular to rely on statements made by Lilly to the FDA or another party if Plaintiffs were in the class of persons whom Lilly could reasonably have expected to rely on such statements. *See Ernst & Young*, 51 S.W.3d at 578–580. This test is stricter than the foreseeability test applied in negligence cases; the fraudfeasor must have information that the third party is particularly likely to rely on the statements. *See id.* at 581.

 It is undisputed that Lilly told the FDA in 1973 that thimerosal was non-toxic. However, Plaintiffs have not offered evidence that Lilly knew or was reckless in failing to ascertain whether thimerosal was toxic in the levels commonly found in various drugs, nor have they offered evidence that information available to Lilly indicated such toxicity. Without this information, Plaintiffs have not shown that Lilly knew of the falsity of its statement or that it recklessly disregarded the truth. In fact, Plaintiffs have not even offered sufficient evidence to show that Lilly's statement was false.

Plaintiffs also have not offered evidence that Lilly intended for the FDA would rely on the representation, i.e., that the FDA considered Lilly as the sole source of information such that it would not otherwise discover the article. Plaintiffs have also failed to offer evidence that the FDA actually and justifiably relied on Lilly's information. Since Lilly's last patent expired in 1972 and other manufacturers were apparently producing thimerosal at the time of the FDA's inquiry, the available facts point to the opposite conclusion: the FDA probably had other sources of information and therefore did not actually rely on Lilly's representations. Lastly, Plaintiffs have failed to offer evidence showing causation. Plaintiffs have not alleged that the FDA would have banned the use of thimerosal in vaccines even if Lilly had turned over all the articles and information named by Plaintiffs. Therefore, as to the FDA, Plaintiffs have proved none of the elements of fraud.

 Plaintiffs also allege that Lilly defrauded them by concealing material information from consumers and the general public about thimerosal and making public statements that it was non-toxic. If Lilly had a duty to disclose information about thimerosal, a failure to disclose that information could constitute a misrepresentation. *See, e.g., Columbia/HCA Healthcare Corp. v. Cottey*, 72 S.W.3d 735, 744 (Tex. App.-Waco 2002, no writ). A duty to disclose arises when a party "voluntarily discloses partial information, but fails to disclose the whole truth" or when a party "makes a representation and fails to disclose new information that makes the earlier representation misleading or untrue." *Id.* Both situations apply to Plaintiffs' allegations against Lilly. It is undisputed that Lilly disclosed some information both to the FDA and the public about thimerosal. This information indicated that thim-

erosal was safe, at least in certain amounts and for certain uses.

However, Plaintiffs' claim fails once again for lack of evidence. Plaintiffs have provided no evidence that Lilly had information indicating that the amount of thimerosal contained in vaccines could cause mercury poisoning or autism in children. Plaintiffs have also failed to provide evidence that they actually and justifiably relied on representations made *by Lilly*. Given that the thimerosal actually received by Minor Plaintiffs was manufactured by another company, this element is especially important. Even if Plaintiffs intend to allege that they relied on statements by Minor Plaintiffs' doctors which were informed by Lilly's statements, they have not shown actual reliance by those intermediaries.

 Finally, Plaintiffs allege that all Defendants conspired to defraud Plaintiffs about the safety of thimerosal. Civil conspiracy has five elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Goldstein v. Mortenson*, 113 S.W.3d 769, 779 (Tex.App.-Austin 2003, no pet.); *see also Operation Rescue–Nat'l v. Planned Parenthood of Houston & Southeast Tex., Inc.*, 975 S.W.2d 546, 553 (Tex.1998). It also requires "a preconceived plan and unity of design and purpose," *Goldstein*, 113 S.W.3d at 779, and specific intent on the part of each conspirator. *San Antonio Credit Union v. O'Connor*, 115 S.W.3d 82, 91 (Tex.App.-San Antonio 2003, writ denied). Mere "proof of acting in concert" is insufficient to establish specific intent. *Id.* at 93. Despite these obstacles, Texas does allow plaintiffs to establish the common purpose or object element to be established by "reasonable

inferences." *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex.1979).

Plaintiffs allege that fraud constitutes the unlawful act. As discussed above, Plaintiffs have not tendered sufficient evidence such that a reasonable trier of fact could find that Lilly committed fraud.

Plaintiffs also fail to support the other elements of conspiracy. While Plaintiffs have alleged that Lilly did conspire with the other Defendants, Plaintiffs offer neither specific allegations nor evidence that any of the Defendants acted in concert to prevent disclosure of any information about the alleged dangers of thimerosal. For example, Plaintiffs offer no specific allegations or evidence of communications between Defendants. At most, Plaintiffs have alleged that Defendants acted in concert. However, Texas law does not recognize that as sufficient evidence of conspiracy.

## IV. Conclusion

This Court recognizes the great difficulties faced by children with autism and the tremendous time and resources their parents must devote to their care. However, the Court cannot lessen the burden imposed by the law on the Plaintiffs to provide some evidence in their case against Lilly. Plaintiffs must offer evidence such that a reasonable trier of fact could find in their favor in order to withstand a motion for summary judgment.

Plaintiffs have produced no evidence that Lilly knew of or should have known of the risk of the type of injury suffered by Minor Plaintiffs; that thimerosal caused Minor Plaintiffs' injuries; that Lilly breached any duty to test its product or warn of its dangers; that Lilly was grossly negligent; that Lilly should be held strictly liable for injuries suffered by Minor Plaintiffs; or that Lilly conspired with the other Defendants to conceal information about thimerosal. In addition, this Court

finds as a matter of law that Lilly owed no duty to Plaintiffs regarding thimerosal. Therefore, Defendant Eli Lilly's Motion for Summary Judgment is hereby **GRANTED** as to all claims by Plaintiffs and Minor Plaintiffs. All claims against Eli Lilly are **DISMISSED WITH PREJUDICE**. All Parties are to bear their own taxable costs, expenses, and attorneys' fees incurred herein to date. A Final Judgment addressing this and all claims will be entered in due course.

**IT IS SO ORDERED.**